[No. B194463. Second Dist., Div. Three. Sept. 19, 2008.]

JERRY HILL et al., Plaintiffs and Appellants, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Defendant and Respondent.

1442

1446.

**COUNSEL**

Hennigan, Bennett & Dorman, J. Michael Hennigan, Robert L. Palmer, Mark Anchor Albert; Gianelli & Morris, Timothy J. Morris; Ernst & Mattison, Raymond E. Mattison; Law Offices of Robert S. Gerstein and Robert S. Gerstein for Plaintiffs and Appellants.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Joren S. Bass, Sheila L. Birnbaum, Douglas W. Dunham, Ellen P. Quackenbos; Heller Ehrman, Paul Alexander; Robie & Matthai and James R. Robie for Defendant and Respondent.

Sonnenschein Nath & Rosenthal and Barry Leigh Weissman for National Association of Insurance Commissioners as Amicus Curiae on behalf of Defendant and Respondent.

Sedgwick, Detert, Moran & Arnold and Christina J. Imre for Association of California Insurance Companies, American Insurance Association and Pacific Association of Domestic Insurance Companies as Amici Curiae on behalf of Defendant and Respondent.

Katten Muchin Rosenman, Stuart M. Richter and David M. Newman for National Association of Mutual Insurance Companies as Amicus Curiae on behalf of Defendant and Respondent.

Dewey & LeBoeuf, Dean Hansell and Sharon C. Corda for National Conference of Insurance Legislators as Amicus Curiae on behalf of Defendant and Respondent.

Horvitz & Levy, Barry R. Levy, Jeremy B. Rosen and S. Thomas Todd for Personal Insurance Federation of California as Amicus Curiae on behalf of Defendant and Respondent.

Lisa Madigan, Attorney General of the State of Illinois; and Robert E. Wagner for Illinois Division of Insurance as Amicus Curiae on behalf of Defendant and Respondent.

Greenberg Traurig, Carol Livingston and J. Adam White for Freedom Works as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**MALLANO, J.**[*]—In this nationwide class action, 50 million present and former policyholders of State Farm Mutual Automobile Insurance Company (State Farm) contend that during the class period, 1983 to 1998, State Farm breached a duty to pay billions of dollars in dividends and, as a result, created an excessive surplus.

State Farm moved for summary judgment based on the business judgment rule, asserting that the board of directors (Board) had made its financial

[*] Presiding Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

decisions on an informed basis, in good faith, and with the honest belief that it was acting in the company's best interests. Plaintiffs countered that the rule was not applicable because (1) the Board did not adequately consider whether to declare dividends but merely rubberstamped management's recommendations; (2) the Board was not sufficiently informed about dividends; (3) the Board's dividend practices were fraudulent or dishonest; and (4) the Board's dividend decisions were totally without merit.

■ The trial court granted summary judgment, concluding that the business judgment rule applied as a matter of law. We agree. First, the Board could properly rely on information from State Farm's management and actuarial department in its deliberative process. Second, the Board was sufficiently informed—through written financial materials, oral presentations from company officers, and discussions during Board meetings—to make independent decisions about dividends. Third, State Farm did not engage in fraud by failing to indicate in its insurance policies and bylaws that it paid dividends from certain sources of income and did not sell invested assets for that purpose. It had no duty to disclose that type of information. Nor was there anything fraudulent about the financial information annually sent to policyholders; it was based on audited reports prepared by independent accountants in compliance with state regulatory principles of accounting. Fourth, in applying the business judgment rule, a court does not consider the merits of a board's decisions. Rather, the court focuses on the decisionmaking *process* to ensure that it was not tainted by fraud, oppression, illegality, or the like. Thus, plaintiffs' attack on the merits of State Farm's decisions is of no import. We accordingly affirm.

# I

## BACKGROUND

On June 17, 1998, plaintiffs filed this class action against State Farm, alleging that, as policyholders, they were entitled to dividends under their insurance policies and that State Farm had improperly withheld dividends in order to increase its "surplus." The term "surplus" means an insurance company's assets less liabilities. Put another way, "surplus" is the capital available to back up an insurer's obligations under its policies.

Plaintiffs alleged that "State Farm breached its duty [to policyholders] by amassing surpluses far in excess of what State Farm reasonably needed to meet its present and future insurance obligations," thereby reducing dividends. As relief, plaintiffs requested damages, attorney fees, and an injunction

barring State Farm from pursuing the practices that had reduced the dividend payments.

The complaint set forth six causes of action: breach of contract, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, violation of the Consumers Legal Remedies Act (Civ. Code, §§ 1750–1784), and violation of the unfair competition law (Bus. & Prof. Code, §§ 17200–17209).

State Farm demurred to the complaint on the ground that the payment of dividends was subject to the discretion and business judgment of the Board. Plaintiffs filed opposition. By order dated October 16, 1998, the trial court sustained the demurrer without leave to amend as to the cause of action under the Consumers Legal Remedies Act. On the remaining claims, the trial court sustained the demurrer with 20 days' leave to amend. The trial court also instructed plaintiffs to attach their insurance policies to the amended complaint.

On October 27, 1998, plaintiffs filed a first amended complaint, realleging the five causes of action that survived the demurrer. In essence, plaintiffs alleged that State Farm had overstated its losses and understated its income so as to reduce the dividends to policyholders. Plaintiffs attached their policies, as instructed.

Between 1983 and 1989, the policies in most states provided, "[T]he first insured named in the declarations is entitled . . . to share in the earnings and savings of the company in accordance with the dividends declared by the Board of Directors on this and like policies." After 1989, the policies in most states read, "[T]he first insured named in the declarations is entitled . . . to receive dividends the Board of Directors *in its discretion may* declare in accordance with reasonable classifications and groupings of policyholders established by such Board." (Italics added.)

Further, in a newsletter sent to California policyholders in 1998, State Farm described dividends as "a return of part of your premium because claim costs were less than anticipated." The newsletter also stated that "[o]ur goal as a mutual company is to put your interests first."

Throughout the class period, the bylaws of State Farm provided: "Subject to the provisions of law regarding return of excess premiums, the Board of Directors may authorize from time to time such refunds or credits to policyholders from the savings and gains of the Corporation and upon such

terms and conditions and in such amounts or percentage as may, in their judgment, be proper, just and equitable."

## A. *Demurrer to Amended Complaint*

On November 23, 1998, State Farm filed a demurrer to the first amended complaint, arguing again that the Board had properly exercised its discretion and business judgment with respect to declaring dividends. Plaintiffs filed opposition.

In January 1999, the trial court, Commissioner Bruce E. Mitchell presiding, sustained the demurrer without leave to amend as to all causes of action and entered a judgment of dismissal. Plaintiffs filed a timely appeal.

On January 30, 2001, Division One of this district filed a split decision, reversing the judgment of dismissal and reinstating the claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the unfair competition law (*Hill v. State Farm Mutual Automobile Insurance Co.* (Jan. 30, 2001, B133262) [nonpub. opn.] (*State Farm I*)). The court concluded that plaintiffs had adequately pleaded their claims under *California* law and that an accounting would be an appropriate remedy if plaintiffs prevailed on the contract or covenant claim.

In rejecting State Farm's contention that the action was barred by the business judgment rule, the court distinguished this division's decision in *Barnes v. State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365 [20 Cal.Rptr.2d 87] (*Barnes*). The court explained that, in *Barnes*, "a policyholder sued State Farm Auto, seeking to 'compel [it] to distribute "its unjustifiably large surplus" back to its policyholders.' (*Id.* at p. 370.) The plaintiff alleged that 'State Farm had accumulated a surplus fund consisting of premiums and investment income in excess of $10 billion . . . [and] that such conduct by State Farm amounted to an unjustified hoarding of surplus funds, for no legitimate business purpose and all to the detriment of policyholders who otherwise could have received either reduced premium rates or substantial dividends.' (*Ibid.*)

"In *Barnes*, the trial court sustained State Farm Auto's demurrer without leave to amend. The Court of Appeal affirmed, stating:

" 'Whether "a private corporation should declare and pay a dividend, or make a distribution of its assets is a matter committed to the sound business judgment of the corporation's board of directors." . . . It is thus the general rule that a court will not interfere with a corporate decision to withhold

dividends in the absence of a showing of abuse of the wide discretion which the courts grant to corporate directors.

" 'As one California court recently summarized the rule, "The common law 'business judgment rule' refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. The business judgment rule is premised on the notion that those to whom the management of the corporation has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is one which is ' " '. . . helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes . . . ,' " ' and establishes a presumption that directors' decisions are based on sound business judgment. . . ." . . .

" '[In *Barnes*, the plaintiff], although attempting to plead [around] this rule, has failed to allege facts showing that the [directors'] decision regarding the accumulation of State Farm's surplus was not made in good faith or in what the directors believed to be the best interests of the corporation. He has alleged no facts demonstrating fraud, oppression, corruption or conflict of interest by the directors. [H]e appears to rest his claim upon the singular proposition that State Farm's surplus and dividend policy differs significantly from an industry average. This is clearly insufficient to permit a court to interfere in the management of an apparently successful corporate enterprise.' ([*Barnes*], *supra*, 16 Cal.App.4th at pp. 378–379, citations and fns. omitted.) 'More is needed to establish an exception to the [business judgment] rule than conclusory allegations of improper motives and conflict of interest.' " (*State Farm I, supra*, B133262.)

After quoting from *Barnes*, Division One continued: "In the present case, plaintiffs alleged that State Farm's decisions with respect to dividends were not made in good faith. . . . [¶] . . . [P]laintiffs alleged that the board of directors had improperly withheld dividends by (1) overstating underwriting losses, (2) understating investment income, (3) excluding from operating return the investment income derived from [State Farm's] surplus, and (4) falsely claiming that [the] surplus had to cover the obligations of [State Farm's] affiliated insurance companies.

"Thus, far from relying on conclusory allegations, plaintiffs point to several objective criteria in challenging State Farm's alleged wrongful conduct. This is not a case where the policyholders merely 'rest [their] claim upon the singular proposition that State Farm's surplus and dividend policy differs significantly from an industry average.' ([*Barnes*], *supra*, 16 Cal.App.4th at p. 379.) Moreover, under State Farm's overly broad interpretation of the

business judgment rule, virtually every decision of the board of directors, regardless of the circumstances, would enjoy absolute immunity.

"We are unpersuaded by State Farm's dire prediction that plaintiffs' claims, if allowed to stand, will put the courts in charge of the boardroom. Courts are not empowered to substitute their judgment for that of the board. A [determination] of liability would have to take into account that 'directors should be given *wide latitude* in their handling of corporate affairs because the hindsight of the judicial process is an imperfect device for evaluating business decisions.' . . . Similarly, any determination of liability would have to take into consideration that the business judgment rule 'afford[s] directors *broad discretion* in making corporate decisions and . . . allow[s] these decisions to be made without judicial second-guessing . . . .' " "[T]he business judgment rule provides ample protection for the board's lawful decisions. [¶] . . . [¶]

"We emphasize that this appeal raises a narrow question at the pleading stage: Did plaintiffs sufficiently allege that [State Farm's] directors engaged in bad faith conduct in deciding to declare dividends or in setting the amount thereof? The answer is yes. The first amended complaint alleged that the board[] . . . improperly manipulated objective criteria ([for example,] general expenses, underwriting losses, investment costs) in order to overstate losses and understate income, all for the purpose of reducing dividends to policyholders. We cannot say that the business judgment rule bars plaintiffs' claims at this point in the litigation." (*State Farm I, supra*, B133262, citation omitted.)

On June 1, 2001, plaintiffs filed a second amended complaint, realleging the same claims and material allegations.

After the pleading stage, the trial court certified a nationwide class of 50 million present and former State Farm policyholders, five million of whom reside in California, for the period 1983 through 1998.

## B. *Petition for a Writ of Mandate*

On March 24, 2003, State Farm filed a motion in the trial court to resolve a conflict of laws issue: whether the substantive law of Illinois—where the company was incorporated—or California—where the suit was filed—governed plaintiffs' claims. State Farm argued that Illinois law applied because corporate decisions about dividends involved the internal affairs of the company, and, consequently, the law of the state of incorporation should govern. Plaintiffs asserted that California law controlled. By statement of decision filed on May 21, 2003, the trial court, Judge Charles W. McCoy

presiding, ruled that California law applied because a breach of contract claim is not subject to the business judgment rule.

State Farm promptly filed a petition for a writ of mandate with this district. The petition was assigned to Division One, which issued an order to show cause. After briefing and oral argument, the court vacated the trial court's decision and held, in a published opinion, that substantive Illinois law applied, including the Illinois business judgment rule (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442–451 [8 Cal.Rptr.3d 56] (*State Farm II*)). The court said: " 'Every State in this country has enacted laws regulating corporate governance. By prohibiting certain transactions, and regulating others, such laws necessarily affect certain aspects of interstate commerce. . . . This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation.' . . .

" 'The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.' . . . 'States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care.' . . .

" 'Internal affairs' include ' "steps taken in the course of the original incorporation, . . . the adoption of by-laws, the issuance of corporate shares, the holding of directors' and shareholders' meetings, . . . *the declaration and payment of dividends* and other distributions, charter amendments, mergers, consolidations, and reorganizations, the reclassification of shares and the purchase and redemption by the corporation of outstanding shares of its own stock." ' . . .

". . . 'It would be impractical to have matters . . . which involve a corporation's organic structure or internal administration[] governed by different laws. It would be impractical, for example, if . . . an issuance of shares, *a payment of dividends*, a charter amendment, or a consolidation or reorganization were to be held valid in one state and invalid in another. . . .' " (*State Farm II, supra*, 114 Cal.App.4th at pp. 442–443, citations omitted.)

In addressing the trial court's reasoning, the court also stated: "In the present case, State Farm policyholders challenge the board of directors' decision whether to declare dividends. The policyholders rely on the language

in their policies, a newsletter, and the bylaws, contending they have a contractual right to dividends that must be honored in accordance with their reasonable expectations. . . .

". . . [T]he policyholders [argue that] their right to dividends should be adjudicated under contract law, the business judgment rule notwithstanding. And the trial court commented, '[State Farm is] not going to be able to use . . . corporation law as a trump over that contractual obligation.' But the business judgment rule, which accords deference to the decisions of the board of directors, is reflected in the language of State Farm's policies, newsletter, and bylaws. The rule is, in essence, written into the contract.

"Simply put, the policyholders challenge a decision of the board of directors that falls within State Farm's internal affairs. The causes of action in the complaint, though labeled in common terms—breach of contract and breach of the covenant of good faith and fair dealing—involve 'matters *peculiar* to the relationships among or between the corporation and its current officers, directors, and shareholders . . . .' . . . As to those matters, the law of State Farm's place of incorporation, Illinois, applies . . . , not California's law on contracts . . . .

"In other words, '[t]he law applicable to a contract dispute . . . does not control claims relating to the internal affairs of the corporation.' . . . '[T]he plaintiff's contention that this suit[,] being one on a contract[,] does not involve the internal affairs of a foreign corporation is without merit.' " (*State Farm II, supra*, 114 Cal.App.4th at pp. 446–447, citations omitted.)

The court also discussed the business judgment rule under Illinois law. " 'The business judgment rule is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation. . . . Like most rebuttable presumptions, it arises by operation of law. . . . However, the plaintiff may rebut the presumption by presenting evidence that the director[s] acted *fraudulently, illegally, or without becoming sufficiently informed to make an independent business decision*. . . . [¶] . . . [¶] . . . The burden is on the party challenging the decision to present facts rebutting the presumption.' " (*State Farm II, supra*, 114 Cal.App.4th at p. 450.) An Illinois court had put it this way: " 'The decision concerning the declaration of a dividend where a legal dividend fund is available rests within the sole discretion of the board of directors. Courts are reluctant to interfere with the exercise of the directors' business judgment unless the withholding is *fraudulent, oppressive or totally without merit*.' " (*Ibid.*) And a third court had stated the business judgment rule protected the directors' decision absent a showing of " 'fraud, oppression, or dishonest conduct.' " (*Ibid.*, italics omitted.)

The court summarized these various formulations, concluding: "[A]bsent one of the exceptions to the business judgment rule—fraud, oppression, dishonesty, total lack of merit, illegality, or a failure of the board of directors to become sufficiently informed to make an independent decision—a corporation is not liable for a lack of dividends." (*State Farm II, supra*, 114 Cal.App.4th at p. 451.)

Further, as to plaintiffs' causes of action, the court pointed out the differences between the covenant of good faith and fair dealing under California and Illinois law. In Illinois, the covenant provides a cause of action, sounding in tort, only where an insurer breaches a duty to settle a third party claim against the insured. (*State Farm II, supra*, 114 Cal.App.4th at p. 451.) With that exception, the covenant does not support an independent cause of action or permit the recovery of tort damages. (*Id.* at pp. 451–453.) Rather, it is a rule of construction used " 'to determine the intent of the parties where a contract is susceptible to two conflicting constructions.' . . . ' "[W]here an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." ' " (*Id.* at p. 452, citation omitted; accord, *Fox v. Heimann* (2007) 375 Ill.App.3d 35, 42 [313 Ill.Dec. 366, 374, 872 N.E.2d 126, 134]; *Mid-West Energy Cons. v. Covenant Home* (2004) 352 Ill.App.3d 160, 163–164 [287 Ill.Dec. 267, 270–271, 815 N.E.2d 911, 914–915]; *St. Mary's Hosp. v. Health Pers. Options* (1999) 309 Ill.App.3d 464, 469–470 [242 Ill.Dec. 682, 686, 721 N.E.2d 1213, 1217]; *Perez v. Citicorp Mortgage, Inc.* (1998) 301 Ill.App.3d 413, 423–424 [234 Ill.Dec. 657, 664, 703 N.E.2d 518, 525].)

And even where the covenant applies, " ' "[p]arties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith." . . . "Express covenants abrogate the operation of implied covenants so courts will not permit implied agreements to overrule or modify the express contract of the parties." ' " (*State Farm II, supra*, 114 Cal.App.4th at p. 453.)

Finally, the court discussed the nature of a mutual, as opposed to a stock, insurance company. "State Farm is a mutual insurance corporation. As such, it 'issues no capital stock and is cooperatively owned by its policyholders, who are both the insurers and the insureds . . . .' . . .

" 'Mutual insurance companies are organized, maintained, and operated solely for the benefit of their policyholders . . . . Such companies do not generate traditional entrepreneurial profits, but rather seek to meet their obligations at the lowest possible cost to the policyholders who, by paying premiums, provide the companies' exclusive source of capital.' . . .

" 'Policyholders in mutual companies are denominated "members" of the company; their ownership rights in the company are their "membership interests." Members of mutual insurance companies have many of the same rights as stockholders in corporations, including the right to vote and the right to residual surplus upon liquidation.' . . .

"State Farm does not offer insurance policies as investment opportunities but instead provides policyholders with protection against loss. In contrast, a stock insurance company seeks to earn a profit for the benefit of its stockholders, who may or may not be policyholders. . . .

" '[M]utual insurers have greater difficulty [than stock insurers] in raising capital to fund growth, and hence, must rely to [a] greater extent on accumulated surplus and income from new members to support growth. . . . [M]anagers of mutual insurers tend to exercise more discretion which tends to favor long-term stability over greater risk.' " (*State Farm II, supra*, 114 Cal.App.4th at pp. 440–441, citations omitted.)

After the court granted State Farm's petition, the case returned to the trial court for additional proceedings.

C. *Motion for Summary Judgment*

In October 2005, State Farm filed a motion for summary judgment or, in the alternative, for summary adjudication as to each cause of action. State Farm argued that the business judgment rule, as applied in Illinois, barred the action in its entirety. In support of summary adjudication, State Farm asserted (1) the contract claim failed because the insurance policies and bylaws did not accord plaintiffs an enforceable right to dividends at any time or in any amount; (2) a separate cause of action for breach of the covenant did not exist under Illinois law; and (3) the unfair competition law did not apply because it was a California statute. State Farm submitted declarations and exhibits in support of the motion. Plaintiffs filed evidence in opposition.

1. *State Farm's Evidence*

State Farm based the price of its automobile policies—its premiums—in part on actuarial data obtained from each state. Its underwriting goal was to sell policies at an affordable price so that total premiums would equal total losses and expenses. Thus, the company attempted to break even on the sale of insurance. At the same time, State Farm maintained a surplus on which it earned investment income. The company would use that income in the event

of an operating loss. During the class period, State Farm generally paid dividends if its underwriting results were better than expected. The company did not sell assets from the surplus to pay dividends. Rather, the assets provided a source of funds for catastrophes and allowed the company to charge low premiums and reduce rates.

In 1983, when the class period began, the Board consisted of 11 members. By 1998, the last year of the period, the Board had grown to 13 members. The Board met quarterly—in March, July, September, and December—at State Farm's headquarters in Bloomington, Illinois. Those meetings consisted of a series of presentations over a two-day period. State Farm's officers, some of whom were also directors, made oral reports on State Farm's finances, operations, investment activities, pension funds, and audit results. The presentations led to discussions among the directors on those topics.

During the year, the directors received numerous written financial reports, such as (1) monthly "Financial Statements" (around eight pages in length), showing a breakdown of assets, liabilities, and surplus; (2) quarterly "Operations Reviews" (around eight pages), which set forth underwriting profits and losses, and investment activity by category; (3) "Quarterly Statements" (around 64 pages), providing detailed information about the company's financial condition, including line-item data about increases and decreases in surplus; (4) an annual "Report on Audits of Financial Statements—Statutory Basis" (around 27 pages), prepared by Coopers & Lybrand (Audited Reports), listing subcategories and the corresponding amount of income, losses, and surplus; and (5) the "Annual Statement" (of varying lengths, up to 305 pages), consisting of multiple "schedules" of specific information on the company's overall financial condition, including surplus.

The monthly and quarterly financial statements, together with the quarterly operations reviews, enabled the directors to track profits, losses, and the size of the surplus on a continuing basis. State Farm invested its surplus, primarily in stocks, bonds, and real estate.

The surplus consisted of five categories: (1) "catastrophe reserve—reinsurance," which provided a source of protection in the event of a catastrophe; (2) a minimum "Guaranty Fund" required by statute; (3) unassigned funds, which represented the unassigned retained earnings of the company; (4) unrealized capital gains; and (5) funds to protect the policyholders of State Farm's subsidiaries (also called affiliates), namely, State Farm Life Insurance Company and State Farm Fire and Casualty Company.

Vincent Trosino held a managerial position with State Farm beginning in 1972, becoming a member of the Board in 1987. From 1987 to 1990, he was vice-president, chief administrative officer; from 1991 to 1998, he was executive vice-president, chief operating officer; and in 1998, he assumed the position of president, chief operating officer. Trosino testified that the Board's quarterly meetings involved "interactive" presentations by several officers, including himself. "These discussions," he said, "combined with the written materials provided to the Board, allowed the Directors to gain a good, working understanding of the essential aspects of [State Farm's] operations and finances, including its surplus position and how that position was evolving."

Since 1987, Trosino has served as an officer-director in considering and determining the level of State Farm's surplus, and in considering, recommending, and voting upon whether to declare a dividend as well as the amount of the dividend. He periodically reviewed State Farm's financial performance and surplus level with the company's actuarial department. Those reviews involved constant monitoring of the surplus, profits and losses, and income from all sources, including investments, and examining whether conditions warranted a dividend and, if so, the amount.

According to Trosino: "Ultimately, the appropriate range of surplus is not a matter of a single rating or ratio, but rather is a matter of judgment that is exercised by senior officers and our Board of Directors, and I have participated directly in making these judgments during the period 1987 to the present. . . . [¶] . . . [The] surplus supported [State Farm's] ability to meet the needs of its policyholders, remain competitive, charge lower premiums, and support the reasonable growth of its business. . . . [¶] . . . During discussions among the Board of Directors, we concluded that retaining [capital gains] as additions to our surplus was the wisest course of action and in the best interests of our policyholders. This growth in surplus added to our ability to provide financial protection to our policyholders and, in addition, added to our ability to reduce rates or lessen the size of rate increases to our policyholders. Had we determined to liquidate any significant portion of our surplus in order to pay a one-time dividend, it would have reduced both our financial strength and our ability to reduce or lessen the size of increases of rates and premiums . . . ." State Farm typically did not liquidate long-term investments except in catastrophe situations. The Board was opposed to "dividending out," or selling, an asset in the surplus to pay a dividend. On the other hand, State Farm had no problem using money generated by short-term investments in the surplus, for example, maturing treasuries. That money was used "to offset the cost of operations," such as an underwriting loss.

Trosino recommended that the Board declare dividends primarily when State Farm's underwriting return exceeded its underwriting targets for the previous 12 months or so. By the same token, a dividend was usually not recommended if the company had greater than anticipated losses on its policies. Trosino's recommendations were based on a state-by-state analysis. Under this method, policyholders received a dividend if they lived in a state that produced higher income than the "target underwriting return" for that state. If policyholders did not live in such a state, they did not receive a dividend. In making a dividend decision, the Board used a "worksheet" that showed the pertinent underwriting statistics for each state.

Trosino also considered the financial effect of natural disasters. For instance, he did not recommend dividends in 1989, 1990, 1995, or 1996—in light of Hurricane Hugo (1989), other catastrophes (1990), and the uncertain situation after the Northridge earthquake (post-1994); during those times, the level and cost of auto insurance claims rose significantly, and underwriting losses were much greater than expected.

This approach allowed the surplus to grow during the class period—mainly through investment return—from $8.2 million in 1983 to $41.8 billion in 1998, as indicated in the Audited Reports. According to State Farm and plaintiffs' expert witnesses, the Board declared dividends in 10 years of the 15-year class period, totaling $2.87 billion, as shown below.

| | |
|---|---|
| April 1983: | $69,600,000 |
| April 1984: | $133,560,000 |
| November 1987: | $202,700,000 |
| November 1988: | $157,000,000 |
| December 1991: | $198,500,000 |
| August 1992: | $169,300,000 |
| October 1993: | $205,900,000 |
| April 1994: | $187,500,000 |
| November 1997: | $651,000,000 |
| June 1998: | $891,600,000 |

In making dividend recommendations to the Board, Trosino relied in part upon input from the actuarial department. Gregory Hayward, an assistant vice-president and actuary who has been with State Farm since 1979, described the work of the company's actuaries. They conducted an ongoing actuarial analysis of the financial position and needs of State Farm for use by senior management in assessing the company's surplus, rates, and dividends. Hayward, who heads the research unit of the actuarial department, routinely monitored and analyzed State Farm's surplus levels and reviewed his findings with at least one key officer and member of the Board.

The actuarial department maintained a close watch on gains and losses, expenses, and State Farm's overall financial condition and had an ongoing dialogue with management as to whether a dividend or rate reduction should be recommended to the Board. In the years when a dividend was not recommended, State Farm had usually suffered greater than anticipated losses on its policies. For instance, a dividend was not recommended in 1995 or 1996 because State Farm had suffered underwriting losses in the preceding years—$1.65 billion in 1994 and $1.22 billion in 1995. In the latter half of 1996, underwriting results improved, yielding a profit of $594 million for the year. As a result, a dividend was declared in 1997.

State Farm did not have a practice or rule against declaring dividends in the event of an underwriting loss. In Hayward's words, "We [took] into consideration all of the financial aspects of the company." He pointed out that State Farm also earned investment income on *nonsurplus* items such as reserves: unearned premium reserves and loss expense reserves. If a dividend was declared notwithstanding an underwriting loss, State Farm would still use underwriting results, as opposed to investment income, to choose the states in which to pay dividends.

As one director testified, the Board considered at least three factors in deciding whether to declare a dividend: underwriting results, net income before taxes (including interest and dividends earned on the surplus), and the net worth of the company. There were several years—1987, 1988, 1991, and 1992—in which State Farm declared a dividend even though it had incurred an underwriting *loss* that year and the preceding year.

Roger Joslin was a principal financial officer of State Farm since 1969 and a director since 1988, continuing in both capacities until his retirement in 2002. He also participated in considering, recommending, and voting for dividends. In July 1987, Joslin, then the company's treasurer, drafted a "memorandum to file," stating: "The Board of Directors has broad discretion concerning declaration of dividends to policyholders. Nothing, including past practices, dictates how dividends shall be apportioned." As noted by Joslin, when a dividend recommendation was made to the Board, the directors gave it "due consideration."

Wendy Gramm, a director from 1994 to 2002, who had served as chair of the United States Commodity Futures Trading Commission, recalled that "I or others on the Board did ask a lot of questions of State Farm management on their dividend proposals." Dr. Robert Jaedicke, a director from 1991 to 1999, and a former dean of the Stanford Graduate School of Business, referred to the discussion of dividends as an "interactive session" that was

"sometimes rather lengthy"—possibly "half of the morning meeting" with "continual discussion and questions from Board members and comments from officers."

Dr. James Wilson, a professor at the University of California at Los Angeles and a member of the Board beginning in 1995, remembered a 1997 meeting in which management proposed a dividend. The Board voted in favor of a dividend after what he called "considerable discussion." Asked at his deposition about that part of the meeting, Wilson said, "Any time we discuss the financial conditions of the company, there is an extended discussion."

If Trosino or another officer recommended a dividend, then the Board declared one. If such a recommendation was not made, a dividend was not declared. But a dividend might still have been discussed. Trosino explained that if he recommended a rate cut, for example, directors sometimes asked questions about declaring a dividend. The Board would discuss the issue and eventually conclude that it wanted to keep rates as competitive and low as possible and would approve the recommended rate cut. Director Gramm testified that the Board discussed rate cuts in terms of competition and providing a good value to policyholders. To Gramm's best recollection, the Board consistently approved what the officers recommended, be it a dividend or a rate cut. Some Board members would ask questions about the particular recommendation, but they were ultimately satisfied with the answers they received. As Gramm said, "[B]y the time we got to actual votes, . . . people on the board were comfortable with the proposals so that, in fact, we operated more like a collegial body." But she did not recall any occasion when management contemplated a rate cut "in lieu of payment of dividends."

In 2000, Hayward completed an eight-page actuarial report for Trosino and the Board, analyzing the size of the surplus as of the end of the previous year. He concluded that the surplus is "strong and provide[s] our policyholders with superior protection and value at very competitive prices. The risk of ruin, while not zero, is acceptably low. The [surplus is] within a range of reasonableness. The funds are neither inadequate nor excessive giving due consideration to the extraordinary and unique risks and best interests of our policyholders." The report was based on three different mathematical methods or models, all described in detail. Although Hayward finished the report after the class period, he testified: "While in prior years [the] Actuarial Department had not prepared formal [reports] in this format, [the 2000 report] illustrates the type of surplus analysis that we performed going back many years. . . . In the years prior to 1999, State Farm's Actuarial Department analyzed [the surplus] using similar methods and techniques. Each year, [the] Actuarial Department advised executive management about the level and adequacy of

surplus[:] [T]he size [of the] surplus was reasonable and not excessive. . . . Based upon [the] ongoing analysis of surplus, [the] Actuarial Department has never concluded that [the] surplus was excessive or 'too high.' "

The actuarial department did not believe it would be prudent to sell any assets in the surplus for purposes of declaring a dividend. To do so, the actuaries thought, would have eliminated assets as a source of future growth and income, and reduced the ability to charge stable and low insurance rates and premiums. The strength of the surplus also permitted State Farm to implement rate reductions—totaling approximately $437 million—beginning in the second half of 1996 and continuing through 1997. In 1998, State Farm reduced its target underwriting return from zero percent to minus five percent in all states, due in large part to the increase in the surplus. The company made an intentional decision to sell policies at a loss, relying on investment income to remain profitable. From 1997 through 2000, State Farm implemented rate reductions totaling nearly $3 billion.

In his declaration, Hayward described how the insurance industry uses "ratios" as "shorthand expressions . . . to reflect the amount of surplus that exists in relation to an insurer's premium." A "surplus-to-premium ratio" of "1 to 2" means that for every dollar of surplus (the numerator), there are two dollars of premium (the denominator). This is a ratio of 0.50 and is commonly referred to as a surplus level of "50 cents." But the risk exposure from a specific policy vastly exceeds the premium and can vary greatly from one type of policy to the next. For instance, an auto policy with a premium of $500 might have a potential exposure of $100,000; viewed in isolation, that policy would require more than 50 cents for each dollar of premium. Thus, the insurance industry does not rely solely on surplus-to-premium ratios to indicate the appropriate level of surplus. This is perhaps most evident in State Farm's filings with state regulators in which it represented that a 0.50 ratio is "prudent." That representation merely indicated the *minimum* amount of surplus needed for *ratemaking* purposes. State regulators are concerned with preventing insolvency and focus on whether the surplus is *adequate*, not whether it is excessive: They consider 0.50 adequate and any ratio below 0.33 to be a sign of potential insolvency. In addition, State Farm disclosed its *actual total* surplus to regulators and was never informed that the 0.50 ratio is a maximum or that a dividend was warranted. Hayward's declaration is consistent with the testimony that State Farm's chief actuary, Thomas Morrill, gave before Congress in 1969.

State Farm did not adopt a fixed ratio for evaluating its surplus, but it did address the subject of ratios more than once in writing. On October 31, 1985, Dale Nelson, a State Farm actuary, sent a draft memorandum to Alan Curry, a vice-president and actuary, stating that the "increase [in the surplus] has

caused some to question whether State Farm has 'surplus' surplus." After providing a three-page analysis of that issue, Nelson concluded: "State Farm finds itself in a position where it must stand on its own—there is no one else with the financial resources to back it up. For anyone to argue, then, that State Farm has too much surplus is to ignore present day realities." In an "Office Memo" to Curry, dated March 5, 1986, Nelson devoted eight pages to the same topic, noting that a ratio "in the 0.50→0.75 range is not overly conservative" for State Farm. A June 1991 memo, consisting of seven pages, asked, among other things, "What is the 'right' . . . surplus ratio for State Farm?" The answer, as set forth in the memo, was: "State Farm does not have a specific target, which we believe is <u>the</u> appropriate ratio. It is our objective to be financially able to fulfill our obligations to policyholders. We believe that a [surplus-to-premium] ratio stronger . . . than [0.50] is needed to accomplish that objective." (Original underscoring.)

An August 31, 1991 actuarial report, co-authored by Nelson and chief actuary Gary Grant, was given to the Board. The report consisted of 14 pages, three exhibits, and four appendices. After discussing several theories and factors, it concluded: "Considering the multiplicity and magnitudes of risks involved, the [surplus] could never be too large for absolute assurance of all obligations to customers. However, there are practical limits on how large the . . . surplus can become. Competition is the major constraint. Regulatory views and public perceptions are also important. [¶] Considering all factors, it seems prudent for State Farm to maintain at least 50¢ of unassigned surplus for every dollar of premium written and for the Fire Company to have an additional 15¢ of surplus available for catastrophe losses which exceed those provided in the rates. When circumstances allow, earnings should be used to build and maintain a higher level. A level as high as 75¢ or even $1 appears to be sustainable, strictly from the standpoint of its effect on insurance rates and State Farm's competitive position." As Grant testified at his deposition, *he* did not reach any conclusions about an appropriate level of surplus. Rather, he and Nelson wrote the report so that *management* could evaluate the size of the surplus.

Once a year, the directors received a "Financial Review of Selected Property and Casualty Insurance Groups" prepared by State Farm's research department. A portion of the report, entitled "Analysis of Surplus/Best Underwriting Ratios," compared and discussed the surplus-to-premium ratios of several insurance companies. From 1990 to 1996—the only years covered in the record—one or more of State Farm's competitors had a higher ratio than State Farm. For instance, in 1994, three of State Farm's 11 competitors—Aetna, Safeco, and United Services Automobile Association—had higher ratios.

According to State Farm, its surplus-to-premium ratios for 1983 to 1995 ranged from 0.59 to 0.78; in 1996, the ratio was 0.90; in 1997, 1.11; and in 1998, 1.26. (Plaintiffs' calculations for 1983 to 1995 indicated that State Farm's ratios ranged from 0.87 to 1.05; in 1996, the ratio was 1.20; in 1997, 1.49; and in 1998, 1.69.) The industry *average* during the class period ranged from 0.52 to 1.19.

Director Joslin, who served as treasurer for many years, confirmed that at "many" Board meetings, there were discussions regarding the "appropriate" level of surplus. At each meeting, Joslin or a member of his staff reviewed the company's surplus position. At no time did the Board conclude that the surplus exceeded reasonable limits.

As director Jaedicke stated: "[A]t every meeting we had a financial report which included the increases in surplus, as well as the increases in the various categories of the surplus. And that was always part of the discussion, part of the consideration at every meeting that I could recall." Jaedicke did "not recall anybody on the Board of Directors suggesting that somehow we ought to weaken [our] financial condition by monetizing some asset or set of assets and paying a dividend." During his deposition, Jaedicke was asked about the surplus and replied: "I find it difficult to respond when you say did we ever discuss whether we had surplus surplus, which would indicate we felt we had too much. . . . [¶] . . . [¶] . . . [I]mplicit in [our] discussion [of surplus] would be whether you had too much. That was not where the focus was. Nobody felt that way." He also commented: "Usually, once a year we compared ourselves with the industry. [T]hat was another occasion on which the size of the surplus would be discussed."

Stressing the importance of surplus, director Wilson said that the Board wanted to "feel comfortable that should there be a series of catastrophes in [the] near future, we would have enough money to pay all of the policyholders." He added: "I think we were assured by the performance of the market that our net worth was going up. But, as you know, we carry unrealized capital gains on the books as a separate item, [k]nowing, as we do, as everyone should know, that the market is volatile. What is a gain one year could be a loss in the subsequent years." Wilson acknowledged that "[t]here could be in principle 'too much net worth' "—surplus—but went on to say, "[i]n my judgment, as a director for the seven or so years that I've been on the board, we've never been in a position where we had too much. [¶] In fact, right now, I think we have too little." "I think the net worth has been inadequate to prudently run State Farm . . . ."

During Director Gramm's eight years on the Board, the directors "did look at especially the ratios of . . . surplus-to-premium . . . all the time. And at

some times the surplus was . . . lower than others." Gramm "always felt more comfortable if the surplus to premium [ratio] was closer to one—if not above it—than one half, which was kind of a regulatory minimum." She did not recall State Farm's "focus[ing] on one number that was an important ratio." At every quarterly meeting, the directors reviewed "these numbers," and "given the catastrophes and the hail storms and the hurricanes . . . , [Gramm] had concern about the size of the surplus. . . . [T]hose ratios helped quantify that." She recalled that State Farm's "ratios were not as favorable as some of its competitors' [ratios]." The company did not view the ratios as binding or determinative in making decisions but regarded them as a reliable indicator of its financial condition. "[T]he ratio itself is just one measure," Gramm said.

Actuary Hayward testified that the surplus was also crucial in protecting the financial condition of State Farm's subsidiaries. As he put it, the subsidiaries "add great risk" to State Farm. After several natural disasters, State Farm "recapitalized" its wholly owned companies. For instance, it recapitalized State Farm Fire and Casualty Company after Hurricane Andrew in 1992, provided surplus notes to its Florida company after other hurricanes, and, after disasters in California, provided capital and surplus notes to a State Farm company that writes homeowners insurance here.

When asked at his deposition why State Farm did not sell any of the assets in the surplus to pay dividends, Trosino said that State Farm's business "model" is "to provide for our policyholders at the lowest cost possible a policy . . . that will live up to our obligations to pay them and that we will have the wherewithal to do that come what may. And in doing so, as a mutual company where we only raise our capital through retained earnings or build our capital through retained earnings, we believe our surplus position has to be very, very strong. And that has served us well for over 80 years and being the number one insurer of automobiles and having the highest retention rate of any large company, . . . the model . . . has proven to be successful with our policyholders."

Finally, each year, State Farm prepared a one-page insert, entitled "Annual Report to Policyholders," which was included with the policyholders' premium notices. The insert contained a short message from the chairman. For example, the 1997 insert began: "The past year was a good one for State Farm Mutual and its policyholder group. [¶] Because of improved claims experience, we were able to reduce auto insurance rates in more than half the states. . . . [¶] State Farm Mutual's customers in 29 states and the District of Columbia received more than $651 million in policyholder dividends. The dividend reflects better-than-expected claims experience in those states. . . . [¶] . . . [¶] The funds available for the overall financial protection of State Farm Mutual's 37 million policies in force increased last year, due significantly to favorable investment results." Following the chairman's message

was a breakdown of State Farm's assets and liabilities. The financial information and terminology on the insert were taken from the Audited Reports, prepared by Coopers & Lybrand in compliance with the accounting principles of the Illinois Department of Insurance.

### 2. Plaintiffs' Evidence

In opposition to summary judgment, plaintiffs relied in part on State Farm's evidence, drawing different inferences to support their own arguments. They submitted additional evidence in an effort to challenge the frequency and amount of State Farm's dividends and the size of the surplus. Plaintiffs also offered evidence to show that the Board did not adequately consider whether to declare dividends and was not sufficiently informed to make dividend decisions. Last, plaintiffs asserted that State Farm misled policyholders about the use and size of the surplus.

The opposition papers contained several expert declarations, including one from a professor of corporate governance and one from an actuary. State Farm filed objections to both declarations. (As relevant, the specific evidence offered by plaintiffs will be described and discussed below.)

### 3. Trial Court's Decision

On August 3, 2006, the trial court, Judge Carolyn B. Kuhl presiding, filed an order granting summary judgment and issued a 27-page opinion. The opinion discussed the business judgment rule and the evidence submitted by the parties. It concluded that State Farm had made a prima facie showing that it was entitled to summary judgment and that plaintiffs had failed to "offer evidence sufficient to establish an exception to the business judgment rule." Further, the trial court sustained State Farm's objections to the declaration of plaintiffs' actuarial expert, finding it inadmissible because the declarant was not knowledgeable about mutual, as opposed to stock, companies.

Judgment was entered on August 18, 2006. Plaintiffs filed a motion for new trial, which was denied. They appealed.

## II

## DISCUSSION

Plaintiffs contend they had a right to dividends under their insurance policies and bylaws. State Farm counters that, as a matter of law, there was no promise to declare dividends, making this an open and shut case. It is not so simple. We conclude that plaintiffs did *not* have a right to any amount of

dividends, but State Farm was obligated to *consider* from time to time *whether* dividends *should* be declared.

In considering whether to declare dividends, State Farm was bound by a duty of care, requiring the Board to make decisions in a prudent manner. According to plaintiffs, State Farm breached the duty of care by failing to act prudently in making dividend decisions. In response, State Farm invokes the business judgment rule. Plaintiffs argue that several exceptions to the rule apply. We reject plaintiffs' argument.

■ First, plaintiffs correctly point out that the business judgment rule does not protect the Board if it makes no decision. Yet the Board does not have to decide *every* underlying issue related to dividends. Directors may resort to delegation and reliance on officers and employees for information and recommendations. Here, based on the financial reports and additional input received from others, the Board adequately considered whether to declare dividends. The Board's deliberations complied with the business judgment rule.

Second, plaintiffs properly state that if directors do not become sufficiently informed to make an independent decision about dividends, the company is not protected by the business judgment rule. But this exception is inapplicable here because, through numerous financial reports, including actuarial data, and discussions among the officers and directors, the Board was sufficiently informed and acted independently.

Third, plaintiffs contend that the Board engaged in fraudulent and dishonest behavior in two respects: first, by not explaining its dividend practices in its insurance policies and bylaws; second, by providing policyholders with misleading information about the financial condition of the company. We disagree with the first contention because an insurer need not explain the specifics of its dividend practices, particularly where the board expressly retains discretion in the matter. The second contention is flawed because the information provided to the policyholders was taken from a report prepared by independent accountants in compliance with state regulatory principles of accounting. And in making these contentions, plaintiffs produced no evidence that the Board acted with improper motives.

Finally, plaintiffs argue that the Board's decisions were without merit. This is not, however, an exception to the business judgment rule. Rather, the rule focuses on whether the *process* used to reach the decision was tainted by fraud, oppression, illegality, or the like. The very purpose of the rule is to preclude liability for a company's mistakes, errors, and mere negligence. An exception that permitted consideration of the merits of a board's decisions would swallow the rule.

## A. *Standard of Review*

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" ' "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of *material* fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts [set forth] in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true.' " (*Buxbaum v. Aetna Life & Casualty Co.* (2002) 103 Cal.App.4th 434, 441 [126 Cal.Rptr.2d 682], italics added.)

"[The way in which] the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* [party] would bear *what* burden of proof at trial." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The business judgment rule creates a presumption that the Board acted properly (*State Farm II, supra*, 114 Cal.App.4th at p. 450) and applies to both directors and officers (*Selcke v. Bove* (1994) 258 Ill.App.3d 932, 935–936 [196 Ill.Dec. 202, 205, 629 N.E.2d 747, 750]). The presumption is rebuttable and may be overcome by evidence supporting an exception to the rule. (*State Farm II*, at p. 450.) Although courts have stated that a plaintiff has a "stringent" or "heavy" task in defeating the business judgment rule (see, e.g., *Panter v. Marshall Field & Co.* (7th Cir. 1981) 646 F.2d 271, 297; *State Farm II, supra*, 114 Cal.App.4th at p. 451; *In re Fleming Packaging Corp.* (Bankr. C.D.Ill. 2007) 370 B.R. 774, 786), we do not regard such statements as imposing a heightened burden of proof but rather as a recognition of the rule's practical success.

## B. *Plaintiffs' Claim to Dividends*

Plaintiffs contend (1) they had a contractual right to dividends under their policies and the bylaws, (2) State Farm breached the policies and bylaws

by declaring inadequate dividends, and (3) the business judgment rule does not apply to breach of contract claims. State Farm argues that plaintiffs' contract claim is without merit as a matter of law, and we need not decide if the business judgment rule applies. We conclude that neither of those positions is correct. Plaintiffs did *not* have a right to any amount of dividends, but State Farm *did* have a duty to make dividend decisions in a prudent manner. The business judgment rule is a defense to such a breach of duty claim. To the extent possible, we rely on Illinois law in reaching our conclusion. (See *State Farm II, supra,* 114 Cal.App.4th at pp. 442–449.) If, however, Illinois courts have not addressed a specific point or if the decisions of other courts are of assistance, we rely on principles from other jurisdictions.

■ "[T]he rights and interests of policyholders in the assets of a mutual . . . insurance company are contractual in nature and are measured by their policies and by the statutes, charter and by-laws, if any, which comprise the terms of their contracts . . . ." (*Lubin v. Equitable Life Assur. Soc.* (1945) 326 Ill.App. 358, 365 [61 N.E.2d 753, 756] (*Lubin*).) " 'Whatever rights a member of a mutual company has are delineated by the terms of the contract, and come from it alone. . . . [Here, the] plaintiff says he does not depend for his rights upon the policy . . . . If the plaintiff depends upon anything but his rights under the contract contained in the policy, he depends upon something that does not exist.' " (*Id.,* 61 N.E.2d at p. 756, italics omitted.)

"[I]t is equally important to the policy-holders, as well as to the insurer, that definite and clear provisions . . . should be maintained unimpaired by loose or ill-considered interpretations. . . . The relation of an insurance company to its policy-holders is purely contractual. The parties here were competent to contract and had the right to insert such lawful provisions in the agreement as they saw fit. It is the duty of the courts to construe and enforce them as made, and not to make a new contract for the parties." (*Coons v. Home Life Ins. Co.* (1938) 368 Ill. 231, 238 [13 N.E.2d 482, 485], citation omitted (*Coons*).)

In *Equitable Life Assurance Soc. v. Brown* (1909) 213 U.S. 25 [53 L.Ed. 682, 29 S.Ct. 404], the plaintiff's life insurance policy stated: " 'This policy, during its continuance, shall be entitled to participate in the distribution of the surplus of this society, by way of increase to the amount insured, according to such principles and methods as may, from time to time, be adopted by this society for such distribution . . . .' " (*Id.* at p. 28 [29 S.Ct. at p. 406].) The plaintiff asserted that the insurer had retained a large portion of the surplus to which he was entitled. In rejecting that contention, the high court held: "[T]here is no ground for the contention on the part of the [plaintiff] that he, as a policyholder, had any right to an accounting, and to compel the

distribution of the surplus fund in other manner or at any other time, or in any other amounts than that provided for in the contract of insurance." (*Id.* at p. 47 [29 S.Ct. at p. 411].)

In *Andrews v. Equitable Life Assur. Soc.* (7th Cir. 1941) 124 F.2d 788, the plaintiff filed a class action, alleging that "a surplus fund was accumulated by the defendant in excess of the legal reserve, and that this surplus belongs in equity to all the members who contributed to the same in proportion to their respective contributions." (*Id.* at p. 789.) The complaint sought the distribution of the surplus in accordance with the interests of the policyholders. In affirming a judgment of dismissal, the Seventh Circuit, relying on several similar cases, explained: "The right of the plaintiff and his alleged class to [bring this action] will depend upon the nature of their claim against this fund and not the size of the fund. The plaintiff contends that his right is joint with others in the alleged class, and grows out of a relationship that comes from their membership in a mutual company. In our opinion, the rights of the plaintiff and the persons he purports to represent all stem from their policies in the defendant company. . . . Whatever rights a member of a mutual company has are delineated by the terms of the contract, and come from it alone." (*Ibid.*)

In *Ohio State Life Insurance Company v. Clark* (6th Cir. 1960) 274 F.2d 771 [83 Ohio Law Abs. 166] (*Ohio State Life*), the charter of the insurance company provided, " '[T]he surplus of the company shall belong to the holders of policies on the mutual plan, and shall be apportioned and distributed on such equitable plan as the directors may provide.' " (*Id.* at p. 773.) Each insurance policy "contained a provision to the effect that such policy is entitled to share in the divisible surplus of the company as apportioned or determined by the company." (*Id.* at p. 774.) In affirming a declaratory judgment for the policyholders, the Sixth Circuit said: "General principles of corporate law control the rights of *stockholders*. The rights of *policyholders* are controlled by their policies of insurance and any applicable statutory provisions." (*Id.* at p. 775, italics added.) The court concluded: "We construe [the charter] as giving to the policyholders on the mutual plan a vested contract right to the *beneficial interest* in the surplus . . . ." (*Id.* at p. 777, italics added.)

"This ruling does not mean that the mutual plan policyholders are entitled to receive from the surplus as dividends on their policies more than is provided by the terms of the policies. As policyholders their rights are controlled by the provisions of their policies. Under their policies their rights in the surplus are limited. . . . But, in addition to their rights under the policies they have certain proprietary rights in the surplus acquired by reason of the provisions of [the charter]. The cases relied upon by [the insurer]

which construe policyholders' rights under policy provisions are not controlling in a case where, as here, we are construing . . . policyholders' rights acquired through a provision of the corporate charter." (*Ohio State Life, supra*, 274 F.2d at p. 778, citations omitted.)

Yet *Ohio State Life* does not support the claims of State Farm's policyholders. As the Sixth Circuit made clear: "Nor does [our] ruling mean that the mutual plan policyholders are entitled to have the surplus divided between them at the present time, free from the control of the directors. We are here dealing with the *beneficial interest* in the surplus, a proprietary right, *not the right of possession and distribution*. Their claim is that they are entitled to have their beneficial interest in the surplus preserved in its present status for their benefit as mutual plan policyholders." (*Ohio State Life, supra*, 274 F.2d at p. 778, italics added.)

■ In interpreting insurance policies under Illinois insurance law, "[u]nambiguous clauses must be enforced according to their terms. . . . Suggestions of creative possibilities regarding the interpretation of a contract do not render it ambiguous, but rather, the relevant inquiry to determine if ambiguity exists is whether the contract's provisions are subject to more than one reasonable interpretation. . . . Controversy between the parties regarding the meaning of a provision also does not render the provision ambiguous. . . . When interpreting contract provisions, words are given their plain and ordinary meaning and courts should refrain from adopting interpretations resulting in distortions and creating ambiguities where none exist." (*Young v. Allstate Insurance Co.* (2004) 351 Ill.App.3d 151, 157–158 [285 Ill.Dec. 921, 928, 812 N.E.2d 741, 748], citations omitted.)

Here, State Farm's policies prior to 1990 "entitled [plaintiffs] to share in the earnings and savings of the company in accordance with the dividends declared by the Board of Directors." In 1990, that provision was modified to refer to the dividends that the Board "in its discretion may declare." During the class period, the bylaws remained unchanged, stating that the Board "may authorize from time to time such refunds or credits to policyholders from the savings and gains of the Corporation and upon such terms and conditions and in such amounts or percentage as may, in their judgment, be proper, just and equitable." And a 1998 newsletter to policyholders stated, in connection with a distribution of dividends, "Our goal as a mutual company is to put your interests first."

■ In light of the foregoing case law, we do not construe State Farm's policies, bylaws, or newsletter as conferring a right upon plaintiffs to any amount of dividends at any particular time. Nor did the policyholders have a right to dividends from any specific source, say, the assets in the surplus as

opposed to underwriting income. Yet the Board had a duty to *consider* whether to declare dividends. "It cannot be said that the matter of paying a dividend is solely within the unreviewable discretion of the directors. While the stability and solvency of the mutual company is the prime consideration, the principle of mutuality would be a mere sham, if the directors could, under all circumstances, reserve within the treasury all the accumulation of excess charges. Such procedure, in some cases, would be both unjust to the members and an encouragement to improvidence and arbitrary conduct on the part of the directors in the way of unwise spending and unwise investments." (*Lipsman v. Reich* (N.Y.Sup.Ct. 1939) 173 Misc. 294, 297 [16 N.Y.S.2d 892, 896].)

State Farm's policies and bylaws obligated the Board to *consider* whether to declare dividends from time to time, regardless of whether dividends were actually declared. In undertaking that obligation, the Board owed the policyholders a duty of care. State Farm is "immune from liability . . . only if [the Board] fulfilled certain obligations vis-a-vis the [policyholders] and the corporation. The duty of care requires directors to exercise the degree of skill, diligence and care that a reasonably prudent business person would exercise in similar circumstances." (*Atwood Grain & Supply Co. v. Growmark, Inc.* (N.D.Ill. 1989) 712 F.Supp. 1360, 1367; accord, *Stamp v. Touche Ross & Co.* (1993) 263 Ill.App.3d 1010, 1015 [201 Ill.Dec. 184, 188, 636 N.E.2d 616, 620]; *Gearhart Industries, Inc. v. Smith Intern., Inc.* (5th Cir. 1984) 741 F.2d 707, 720; *Massey v. Disc Mfg., Inc.* (Ala. 1992) 601 So.2d 449, 456.) "The functions of a director [such as] the declaration of dividends . . . constitute basic sources of a director's obligations for purposes of [the] duty of care." (1 ALI, Principles of Corporate Governance: Analysis and Recommendations (1994) § 4.01(a), com. b, pp. 145–146.) "Although directors are vested with broad discretion in determining whether, when, and what amount of dividends should be paid, that discretion is subject to legal restraints. The directors must exercise the requisite degree of care in discharging their duty to act [prudently in light of the circumstances]." (11 Fletcher Cyclopedia of the Law of Private Corporations (2003 rev. vol.) § 5325, p. 582.)

The business judgment rule is a defense to an alleged breach of the duty of care. (See *Ferris Elevator Co. v. Neffco, Inc.* (1996) 285 Ill.App.3d 350, 352–354 [220 Ill.Dec. 906, 908–909, 674 N.E.2d 449, 451–452]; *Radol v. Thomas* (6th Cir. 1985) 772 F.2d 244, 256–257; *Gearhart Industries, Inc. v. Smith Intern., Inc., supra,* 741 F.2d at p. 721; 11 Fletcher Cyclopedia of the Law of Private Corporations, *supra,* § 5325, pp. 586–587.)

We find inapplicable cases holding that the business judgment rule does not apply to a breach of contract claim. (See, e.g., *Willmschen v. Trinity Lakes Impr. Ass'n* (2005) 362 Ill.App.3d 546, 550–551 [298 Ill.Dec. 840, 844,

840 N.E.2d 1275, 1279]; *Fe Bland v. Two Trees Mgt Co* (1985) 66 N.Y.2d 556, 565 [498 N.Y.S.2d 336, 341, 489 N.E.2d 223, 228]; *Anderson v. Nottingham Village Homeowner's* (N.Y.App.Div. 2007) 37 A.D.3d 1195, 1196–1197 [830 N.Y.S.2d 882, 884], amended on reargument (N.Y.App.Div. 2007) 41 A.D.3d 1324 [840 N.Y.S.2d 880].) In those cases, the board was not vested with any discretion in making the challenged decision. (See *Atwood Grain & Supply Co. v. Growmark, Inc., supra*, 712 F.Supp. at p. 1367, fn. 5 [business judgment rule protects directors' broad discretion].) And to the extent the duty of care was implicated, it was breached.

In *Willmschen v. Trinity Lakes Impr. Ass'n, supra*, 840 N.E.2d 1275, the residents of a subdivision filed suit against the homeowners association and the board, alleging breach of a written covenant to maintain the common areas. The defendants had ignored the condition of lakes on the property, permitting the water to become noxious and hazardous. The Illinois Appellate Court rejected the application of the business judgment rule, stating: "[The] rule does not afford a corporation *carte blanche* to behave unlawfully. Hence, . . . 'it may be good business judgment to walk away from a contract, [but] this is no defense to a breach of contract claim.' " (*Id.* at p. 1279.)

Likewise, in *Fe Bland v. Two Trees Mgt Co, supra*, 66 N.Y.2d 556, the residents of cooperatives were forced to pay a "flip tax" upon selling their shares and leases, notwithstanding that the tax was contrary to the terms of the bylaws and the leases. In subsequent litigation, the directors, who had approved the tax, invoked the business judgment rule. The New York Court of Appeals held the defense did not apply, stating that the business judgment rule "constitutes no grant of general or inherent power in the directors to enforce against a shareholder an edict of the directors beyond their authority to make under either the bylaws of the corporation or, in the case of a cooperative apartment corporation, the contract between the corporation and its shareholder/lessees embodied in the proprietary lease." (*Id.* at p. 565; see also *Anderson v. Nottingham Village Homeowner's, supra*, 37 A.D.3d 1195 [business judgment rule not applicable where homeowners association breached written maintenance policy by failing to repair leak in townhouse owner's roof].)

In a further effort to skirt the language of their policies and bylaws, plaintiffs rely on a tax case, *Modern Life & Accident Insurance Company v. C. I. R.* (7th Cir. 1969) 420 F.2d 36, where the Seventh Circuit commented, without any authority or evidentiary support, that a mutual insurance company must accord its members "the right . . . to the return of premiums which are in excess of the amount needed to cover losses and expenses." (*Id.* at p. 38.) The issue in *Modern Life & Accident* was whether the taxpayer was a life insurance or a mutual insurance company, as the two were taxed differently.

We do not regard the court's description of a mutual company's "characteristics" for tax purposes as controlling in an action that, as here, seeks damages for an alleged underpayment of dividends. (See also *Keystone Mut. Casualty Co. v. Driscoll* (W.D.Pa. 1942) 44 F.Supp. 658, 658–659 [for tax purposes, a mutual insurance company cannot create a surplus for safety and growth, but must return unused premiums to members], affd. (3d Cir. 1943) 137 F.2d 907.)

■ More in line with our view is another tax case, *Thompson v. White River Burial Ass'n* (8th Cir. 1950) 178 F.2d 954, where the Eighth Circuit explained: "To say that an essential [characteristic] of mutual insurance is that the excess of premiums received over the actual cost of insurance shall be returned to the policyholders is but another way of saying that the essential of mutuality is insurance at cost. It is *not necessary* to mutuality that *periodic returns* from premiums collected *be made* to the members of an association. It is enough that the *power exists* when a surplus of premium receipts over cost of insurance in fact exists; and the determination of the existence of the appropriate surplus is largely within the discretion of those charged with the management of the association. . . . [¶] . . . [G]*ood* reasons may exist for *failing to make distributions* to the members of a mutual [insurance company.] . . . [T]he use of high premium rates would enable a company to make rebates, while the use of low rates may make distributions impracticable, but . . . in either case the insurance is furnished at cost." (*Id.* at pp. 957–958, italics added.)

■ Last, plaintiffs rely on an Illinois statute that provides: "The board of directors . . . of any company . . . *may* from time to time fix and determine the amount of dividends . . . to be returned to each policyholder, and may for such purpose establish reasonable . . . plans for the distribution of such refunds . . . after retaining sufficient funds for the payment by the company of all outstanding policy and other obligations." (215 Ill. Comp. Stat. 5/54, subd. (2), italics added.) But, as used in this statute, the term "may" does not mean "shall," and a board may declare dividends if and when it so decides, except as mandated by the company's insurance policies, charter, or bylaws. (See *Rothschild v. New York Life Ins. Co.* (1901) 97 Ill.App. 547, 554–555.) Illinois law does require, however, that dividends be paid out of "earned" surplus, not "contributed" surplus. (215 Ill. Comp. Stat. 5/54, subd. (3)(a); see *Lubin, supra,* 61 N.E.2d at pp. 754–755 [discussing types of surplus].)

In sum, under the law of Illinois and other jurisdictions, plaintiffs' rights and interests in State Farm's assets are governed by their insurance policies, bylaws, and newsletter. Those documents did not give plaintiffs an interest in or right to dividends in any amount, at a particular time, or from a specific portion of retained earnings. Yet the Board was obligated to decide whether to declare dividends and had to comply with the duty of care in doing so.

Plaintiffs contend that the Board breached the duty of care in making dividend decisions by not acting prudently. The Board responds that its decisions are protected by the business judgment rule. We now examine the relationship between the duty of care and the business judgment rule as applied to the undisputed material facts of this case.

## C. *The Board's Deliberations*

 " 'Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application. The absence of board action, therefore, makes it impossible to perform the essential inquiry . . . —whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction.' " (*McCall v. Scott* (6th Cir. 2001) 239 F.3d 808, 816, amended on denial of rehg. (6th Cir. 2001) 250 F.3d 997.) The rule does not apply when the directors "did not actually make a decision." (*Summers v. Cherokee Children & Family Serv.* (Tenn.Ct.App. 2002) 112 S.W.3d 486, 528.)

Nor is a company protected if the directors "knew that material decisions were being made without adequate deliberation in a manner that suggests that they did not care [whether] shareholders would suffer a loss [or injury]." (*In re Tyson Foods Consol. S'holder Lit.* (Del.Ch. 2007) 919 A.2d 563, 595; see *In re Walt Disney Co. Derivative Litigation* (Del.Ch. 2003) 825 A.2d 275, 289; accord, *In re Avado Brands, Inc.* (Bankr. N.D.Tex. 2006) 358 B.R. 868, 880; *In re Federal Nat. Mortg. Ass'n Securities* (D.D.C. 2007) 503 F.Supp.2d 9, 24, affd. *sub nom. Pirelli Armstrong Tire Corp. Retir. Med. v. Raines* (D.C. Cir. 2008) 383 U.S. App.D.C. 52 [534 F.3d 779].) A board must "do more than passively rubber-stamp the decisions of the active managers." (*Barr v. Wackman* (1975) 36 N.Y.2d 371, 381 [368 N.Y.S.2d 497, 507, 329 N.E.2d 180, 188].)

Plaintiffs contend that (1) the Board merely rubberstamped management's—the officers'—decisions, (2) the Board did not deliberate about whether the assets in the surplus should be sold—"dividended" or "monetized"—to pay dividends, and (3) the Board did not deliberate about rate reductions.

We have already described the evidence on these points and see no reason to repeat it in detail. (See pt. I.C.1., *ante.*) Suffice it to say that the directors had extended discussions about whether to declare dividends or implement rate cuts. The officers made presentations at Board meetings, supported by information from the company's actuarial department. The officers also addressed what action, if any, the Board should take. The meetings were interactive and sometimes rather lengthy. The directors asked questions and were satisfied with the officers' answers. The Board read numerous financial reports in deciding whether to declare dividends or reduce rates.

In addition, the directors knew that the assets in the surplus were not being sold to pay dividends. The officers' presentations made clear that underwriting results—not the surplus—motivated the declaration of dividends. The periodic financial reports indicated the status of the assets. And, separate from the declaration of dividends, the Board had discussed and decided to retain the assets in the surplus. (See pt. II.D. & F., *post.*) State Farm had protected the surplus in this manner for more than 80 years. But plaintiffs contend the Board was unaware of the practice and did not approve it. We find no basis for that contention.

Nor was the Board a mere rubber stamp for management. The directors thoroughly discussed the issues and questioned the officers. "That the record does not reveal the substance of [all of] the[] questions [asked by the directors] is in fact of little importance. . . . 'What [was] uncovered and the relative weight accorded [it by the directors] in evaluating and balancing the several factors and considerations are beyond the scope of judicial concern.'" (*Treadway Companies, Inc. v. Care Corp.* (2d Cir. 1980) 638 F.2d 357, 384, fn. 52.) It is therefore immaterial that the Board's minutes did not provide a verbatim transcript of the meetings. As an Illinois court has explained, "[I]n recording the minutes of a director's meeting, the secretary, though under an obligation to keep the minutes 'faithfully' . . . is not obligated to include everything that is said in the minutes as long as he accurately transcribes what has taken place." (*Field v. Oberwortmann* (1958) 16 Ill.App.2d 376, 377 [148 N.E.2d 600, 601–602], citation omitted.)

And contrary to plaintiffs' assertion, the minutes *support* the directors' testimony about the Board's decisionmaking process. The minutes in 1990, for example, indicate that at the March 12 meeting, John Killian, the controller, "gave a slide presentation of an overview of Company conditions, . . . reviewed the 1989 Annual Statement . . . , and respond[ed] to the questions from the directors." At the June 11 meeting, Killian "presented slides on the company's financial condition and results from operations and investments." On September 10, Killian gave a slide presentation on the company's financial condition, reported on underwriting results, and answered questions from the Board. At the December 10 meeting, Killian "gave a slide presentation reviewing year-to-date financial and underwriting results . . . . [He] also reviewed operating return results by state . . . , [which] prompted a discussion of the Company's surplus and dividend policy . . . ." In other years, the minutes contained similar entries.

Given the contents of the minutes and the testimony of the directors and the officers that the Board reviewed, questioned, and discussed management's recommendations before voting on them, we conclude that the Board made its *own* decisions. It was not dominated or controlled by the officers. (See

*Minnesota Invco v. Midwest Wireless* (Del.Ch. 2006) 903 A.2d 786, 798, fn. 66; cf. *Cratty v. Peoria Law Library Ass'n* (1906) 219 Ill. 516, 520–525 [76 N.E. 707, 707–709] [court had authority to enforce bylaw that expressly entitled stockholder to payment of dividend of eight percent per annum on first day of each year]; *Channon v. H. Channon Co.* (1920) 218 Ill.App. 397, 398–401 [court properly decreed payment of dividend where board was dominated by director who said he would never declare another dividend, company admittedly could afford to pay dividend, and motion to declare dividend was voted down at board meeting without discussion].)

■ Plaintiffs' attack on the Board's deliberations ignores important principles of corporate governance. The directors do not have to discuss every aspect of the company's business. A board may rely on an officer's recommendations, including his or her silence in some circumstances. "The board . . . may . . . generally instruct senior executives . . . to report major [developments] related to their areas of responsibility. In such a case, in the absence of suspicious circumstances or other unusual facts indicating that reliance is unwarranted . . . , the board would be reasonable in assuming that silence indicated that [no major developments had occurred]. A director may . . . assume that silence from a senior executive [whom] he or she 'reasonably believes' merits his or her confidence . . . reflects a judgment by that senior executive that no major [developments] related to the executive's area of responsibility have [taken place]." (1 ALI, Principles of Corporate Governance: Analysis and Recommendations, *supra*, § 4.01(b), com. b, p. 171, citations omitted.) In short, "directors may rely on the management decisions and recommendations of officers." (*Potter v. Pohlad* (Minn.Ct.App. 1997) 560 N.W.2d 389, 391, fn. 1; accord, *Lanza v. Drexel & Co.* (2d Cir. 1973) 479 F.2d 1277, 1306–1307; *In re HealthSouth Corp. Shareholders Lit.* (Del.Ch. 2003) 845 A.2d 1096, 1107, affd. (Del. 2004) 847 A.2d 1121.)

" 'It has long been recognized at common law that the function of the board of directors is to determine the general business policy of the corporation and that the directors are entitled to rely upon the officers and employees of the corporation, both in carrying out that policy and in receiving reports and information upon which to base that policy.' . . . '[It cannot] be expected of a director that he should be watching either the inferior officers of the [company] or verifying the calculations of the auditors himself. The business of life could not go on if people could not trust those who are put into a position of trust for the express purpose of attending to details of management.' " (*Briano v. Rubio* (1996) 46 Cal.App.4th 1167, 1179 [54 Cal.Rptr.2d 408], citation omitted.)

"Delegation and reliance by directors . . . may take place in numerous and varying factual contexts. [I]n carrying out their oversight obligations directors

will almost certainly have to rely on information, reports, and statements from other persons and from committees of the board. . . . In making business judgments, directors will often have to delegate responsibility with respect to the evaluation of various matters and will almost invariably have to rely on memoranda, documents, and oral statements prepared and presented by *other persons*." (1 ALI, Principles of Corporate Governance: Analysis and Recommendations, *supra*, § 4.01(b), com. b, p. 170, italics added.) "Other persons" includes directors, officers, and employees. (*Id.*, § 4.02(a), p. 188.) "In the usual case, directors and officers will be reasonable in believing that they can rely on [the] information, opinions, reports, statements, decisions, judgments, and performance [of others] without the need for independent verification or further inquiry." (*Id.*, § 4.02, com. i, p. 194; accord, 11 Fletcher Cyclopedia of the Law of Private Corporations, *supra*, §§ 5329.10, 5329.15, 5336, 5344, pp. 601, 603, 617–618, 628.)

Thus, Trosino or another officer could properly rely on advice from the actuarial department in deciding whether to recommend that the Board consider declaring a dividend. And the Board, in turn, could rely on an officer to recommend that it take such action. If Trosino, for example, did not make a recommendation—if he remained silent on the subject—the Board could assume a dividend was not warranted without engaging in a discussion of the matter. Even so, Trosino testified that directors sometimes questioned whether a dividend should be declared if he did not recommend one.

Plaintiffs take the position that the Board had to discuss a possible dividend every year, regardless of what management recommended. But State Farm's insurance policies, bylaws, and newsletter did not require such a discussion. In addition, the written financial reports kept the directors informed of the company's overall financial picture throughout the year. For instance, management did not recommend a multistate dividend in 1990. In that year, State Farm suffered (1) its second consecutive annual underwriting loss (exceeding $1.6 billion in both 1989 and 1990); (2) its third consecutive decrease in annual net income (declining from $721 million in 1988 to $372 million in 1990); and (3) a drop in the surplus of $140 million. It should come as no surprise that a multistate dividend was not discussed—by an officer or director—at the meetings that year.

A similar analysis applies in the other years when dividends were not declared. The Board already knew from the financial reports or the occurrence of catastrophes that a dividend was not warranted, and the lack of a recommendation from management confirmed that dividends need not be discussed. Yet plaintiffs criticize the Board for failing to discuss a possible dividend in 1995, notwithstanding an underwriting loss in that year of $1.2 billion, following on the heels, in 1994, of the Northridge earthquake and a 1994 underwriting loss of $1.65 billion.

Plaintiffs also complain that, in some years, State Farm reduced rates but did not declare a dividend. But those two options are indistinguishable for purposes of the business judgment rule. "Dividends may be made, and by many of the companies have been made largely, by way of abating or reducing the amount of the renewal premium. Where the dividend is so made the actual premium receipt of the year is obviously only the reduced amount. . . . The financial result both to the company and to the policyholders is, however, exactly the same whether the renewal premium is reduced by a dividend or whether the renewal premium remains unchanged but is paid in part either by a credit or by cash received as a dividend." (*Penn Mutual Co. v. Lederer* (1920) 252 U.S. 523, 527–528 [64 L.Ed. 698, 40 S.Ct. 397, 398], fn. omitted.) A "dividend" may take the form of either a payment or a reduced premium. (See *id.* at p. 526, fn. [3] [40 S.Ct. at p. 398, fn. 3]; *Wallace v. Swift Spinning* (1999) 236 Ga.App. 613, 615, fn. 2 [511 S.E.2d 904, 906, fn. 2]; *Rieff v. Evans* (Iowa 2001) 630 N.W.2d 278, 294–295; *Cranley v. National Life Ins. Co. of Vermont* (D.Vt. 2001) 144 F.Supp.2d 291, 295, affd. (2d Cir. 2003) 318 F.3d 105; *Mutual Assur. Co. v. Gluck* (1987) 9 N.J.Tax 55, 63, fn. 4, affd. (Super.Ct.App.Div. 1988) 10 N.J. Tax 234; see also 26 U.S.C. §§ 808(b), 832(c)(11) [defining policyholder dividend].) And in some years (for example, 1997, 1998), the Board approved both.

Relying on *Coons, supra*, 13 N.E.2d at p. 484, plaintiffs assert that dividends must be distributed "at fixed periods." But in *Coons*, the insurance policy stated that "[d]ividends are payable annually on the policy anniversary date . . . ." (*Id.* at p. 484.) Applicable here is *Coons*'s admonition that "[u]nder the terms of the contract a policyholder is not entitled to such dividends in any other manner or time than therein specified." (*Id.* at p. 485.) State Farm's policies and bylaws specified no manner or time for the payment of dividends. Accordingly, dividends were paid when the Board determined that they were warranted in light of underwriting results, net income before taxes, and the net worth of the company.

Finally, plaintiffs contend that State Farm never used investment income from any source to pay dividends. State Farm had two principal sources of income: premiums and investment income on its surplus and reserves. The company paid dividends in several years when it had an underwriting loss. In those years, as the Audited Reports show, dividends were paid out of investment income.

Plaintiffs rely on a portion of Joslin's July 1987 file memo, which stated: "[W]e are reluctant to take any action which appears to return investment income to policyholders. Our philosophy has been to return unneeded premium rather than a portion of total profits." Joslin was the treasurer at the time, but was not yet on the Board. The reluctance to which he referred was

apparently not shared by everyone. On August 12, 1987, the executive committee approved a declaration of dividends, despite an eventual underwriting loss of $124 million that year and a combined underwriting loss the previous two years (1985 and 1986) exceeding $1.1 billion. As stated in the minutes, at the September 14, 1987 meeting of the Board, the proceedings of the executive committee were presented and, "[a]fter a full discussion of the factors considered and the impact on the company's condition," the Board voted to approve the executive committee's action. Dividends in the amount of $202 million were approved. Thus, investment income—not just unneeded premium—was used to pay dividends.

Whether State Farm retained its entire surplus, used some of the investment income from the surplus to pay dividends, or used only investment income from its reserves for that purpose does not alter our conclusion that the Board adequately considered *whether* to declare dividends or reduce rates. Plaintiffs' challenge to the Board's handling of the surplus is a distinct issue we address next.

D. *The Board's Obligation to Make an Informed Decision*

 Under Illinois law, the business judgment rule requires that the directors " 'becom[e] sufficiently informed to make an independent business decision.' " (*State Farm II, supra,* 114 Cal.App.4th at p. 450, italics omitted.)

The directors have "the duty to inform themselves of the material facts necessary to exercise their judgment." (*Stamp v. Touche Ross & Co., supra,* 636 N.E.2d at p. 621.) They "may not close their eyes to what is going on about them in corporate business, and must in appropriate circumstances make such reasonable inquiry." (*Ibid.*) " '[T]he standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact. The Board is responsible for considering only *material* facts that are *reasonably available,* not those that are immaterial or out of the Board's reasonable reach.' " (*Roselink Investors, L.L.C. v. Shenkman* (S.D.N.Y. 2004) 386 F.Supp.2d 209, 220.)

"The informed decision prerequisite . . . focuses on the preparedness of a director or officer in making a business decision as opposed to the quality of the decision itself. Fundamental to an understanding of the standard . . . is the recognition that the extent of the information required is that which the director or officer 'reasonably believes to be appropriate under the circumstance.' . . . In evaluating what is a reasonable belief in a particular situation, the 'informed' requirement . . . should be interpreted realistically and with an appreciation of the factual context in which the business judgment was made." (1 ALI, Principles of Corporate Governance: Analysis and Recommendations, *supra,* § 4.01(c), com. e, pp. 177–178.) "Of course, the business

or professional experience of directors or officers may help to inform them about a decision. They may also be informed by the general views or specialized experience of colleagues. Reliance on reports, representations, statements, and opinions prepared by officers and employees of the corporation and by outside professionals and experts will often be necessary and will, in many situations, satisfy the informational requirement . . . ." (*Id.* at pp. 178–179.)

"The requirement of director independence [inheres] in the conception and rationale of the business judgment rule. The presumption of propriety that flows from an exercise of business judgment is based in part on this unyielding precept. Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. While directors may confer, debate, and resolve their differences through compromise, or by reasonable reliance upon the expertise of their colleagues and other qualified persons, the end result, nonetheless, must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act." (*Aronson v. Lewis* (Del. 1984) 473 A.2d 805, 816, overruled on another point in *Brehm v. Eisner* (Del. 2000) 746 A.2d 244, 254; accord, *Orman v. Cullman* (Del.Ch. 2002) 794 A.2d 5, 24.)

Plaintiffs argue that the Board failed the "informed decision" prerequisite in evaluating the size of the surplus. Not so. The directors were aware of the appropriate material facts through the written and oral reports of the actuarial department and management. The Board often discussed the size of the surplus.

" '[S]urplus provides a safety cushion to absorb adverse results and protects the policyholder and the company by helping maintain the company's solvency during periods of unfavorable operating results.' . . . As the amount of surplus increases, the risk of insolvency decreases. . . . The payment of dividends reduces the surplus. . . .

"State Farm invests its surplus, and the return on that investment is an essential part of the company's overall financial position. An insurer must have an adequate surplus at all times, especially in light of potential catastrophes that may result in substantial damage to numerous policyholders. . . . State Farm refers to its surplus as 'policyholder protection funds.'

■■ "The financial soundness of an insurance company 'depends on numerous factors that are difficult to quantify, and the insurance market is

characterized by substantial diversity across insurers in types of business written, characteristics of customers, and methods of operation. It is impossible to specify the "right" amount of [surplus] for most insurers through a formula.' . . . Each insurance company has its own method for determining the amount of surplus it considers to be adequate." (*State Farm II, supra*, 114 Cal.App.4th at p. 441, citations omitted.)

Internal memoranda between State Farm's actuaries in the mid-1980's indicated that "State Farm does not have a specific target [surplus-to-premium ratio], which we believe is the appropriate ratio." The actuaries concluded then that the ratio should be greater than 0.50 and perhaps as high as 0.75. In the 1991 written report to the Board, the actuaries advised: "When circumstances allow, earnings should be used to build and maintain a higher [ratio]. A level as high as 75¢ or even $1 appears to be sustainable . . . ."

During the class period, State Farm's actuarial department was constantly involved in analyzing the size of the surplus. As Hayward testified, the actuaries used several methods to assess the appropriate level of surplus. He regularly provided oral research reports to at least one key officer and member of the Board. Among the methods used was one that showed "the surplus ratio needed to withstand various asset declines and liability increases and maintain sufficient minimum surplus to continue operations." That method—which appeared in both the 1991 and 2000 written reports for the Board—was based on the following equation:

$$S > \frac{L \cdot (X + Y) + K \cdot P}{(1 - X)}$$

For purposes of this calculation: "L" = Liabilities; "S" = Surplus; "P" = Premiums; "X" = percent decline in assets; "Y" = percent increase in liabilities; and "K" = minimum surplus to continue operations. In the 2000 report, Hayward indicated that, under this method, State Farm should have a surplus-to-premium ratio above 1.48. Using this and other methods employed by the actuarial department for many years *before* 2000, Hayward or another actuary had advised executive management each year that the "size [of the] surplus was reasonable and not excessive." The department "never concluded that [the] surplus was excessive or 'too high.' "

Director Gramm testified that the directors looked at the surplus-to-premium ratios "all the time." The ratios helped her quantify the use of the surplus for catastrophes. She was more comfortable with a ratio of 1.00 or higher instead of the 0.50 regulatory minimum—a view consistent with the opinions expressed in the actuaries' memos. Director Joslin stated that the appropriate level of surplus was discussed at many meetings, and the Board

never concluded that the surplus exceeded reasonable limits. Director Jaedicke echoed that observation, adding that "nobody felt" there was too much surplus. Nor, he said, did anyone ever suggest that State Farm should weaken its financial position by selling an asset to pay dividends. Director Wilson emphasized that the surplus, regardless of its size, was subject to the volatility of the markets. He, too, testified the surplus was inadequate. Trosino, the chief operating officer, indicated that, during Board discussions, "we" concluded that retaining the surplus was the wisest course of action: The surplus provided funds in the event of a catastrophe, allowed the company to remain competitive, and furthered efforts to keep premiums low and to reduce or lessen the size of rate increases. And the actuarial department wholly supported that approach.

Once a year, the directors received a written report that discussed and compared the surpluses and ratios of State Farm and its competitors. State Farm never had the highest ratio. During the class period, its ratios ranged from 0.59 to 1.26 according to the company; the range was 0.87 to 1.69 according to plaintiffs. The receipt of that report, Jaedicke said, was yet "*another* occasion on which the size of the surplus would be discussed." (Italics added.)

In light of the foregoing evidence, we conclude that, as a matter of law, the Board was sufficiently informed to make independent decisions about dividends and the surplus. The directors relied on what they reasonably believed to be adequate information, and the Board's decisions were anything but faithless acts.

For their part, plaintiffs rely on the declarations of a professor of corporate governance and an actuary for the proposition that the Board could not make informed dividend decisions absent actuarial data—statistical calculations—about the surplus. Without resolving the trial court's ruling that the actuary's declaration was inadmissible, we agree. The size of a mutual company's surplus cannot be properly evaluated based on gut reactions, hunches, or intuition. But here, the officers and directors were provided with several categories of information, including actuarial data, upon which they could reasonably rely. As noted, State Farm's actuarial department reported its analyses to management, which, in turn, made oral presentations to the Board. Hayward, the head of the department's research unit, regularly informed a key officer and board member of his findings. Also, plaintiffs' experts did not identify any additional sources or types of actuarial data that State Farm should have considered.

 With respect to plaintiffs' use of experts, we express concern that policyholders might be encouraged to challenge a dividend decision in the

hopes that the business judgment rule will be defeated, and the case will make it to the jury, based solely on the opinion of an "outside expert." As one court cogently observed in that regard: "[T]he validity, accuracy and usefulness of any actuarial study rests largely on the appropriateness of the assumptions on which it is based. [¶] Basically, plaintiffs would ask the court to decide which of the various assumptions . . . offered by both sides are the more reasonable. This would be a distinctly inappropriate task for this court to undertake. '[T]he Court should not address itself to the various accounting theories and contentions which would support the payment of a dividend.' . . . Instead, the court must limit its inquiry to the reasonableness of the actions and motivations of those charged with running this insurance company." (*Pincus v. Mutual Assurance Co.* (Ct.Com.Pl. 1976) 4 Pa.D. & C.3d 71, 77, citation omitted, affd. mem. (1977) 251 Pa.Super. 626 [381 A.2d 913].)

Plaintiffs' discussion of a 1999 e-mail written by State Farm's chief actuary, Gary Grant, misses the mark. For one thing, the e-mail involved issues that arose one year *after* the class period. Second, it indicated that State Farm's surplus-to-premium ratio in 1999 was 1.32—only six cents above the 1998 ratio and at least 17 cents below the ratio recommended by an actuarial calculation made in 2000. Last, the e-mail suggested that the August 31, 1991 actuarial report be rewritten. Hayward accomplished that task less than a year after the e-mail was sent.

In addition, we reject plaintiffs' contention that the directors were misguided about the constituency they were supposed to serve. " 'Mutual insurance companies are organized, maintained, and operated solely for the benefit of their policyholders . . . .' " (*State Farm II, supra*, 114 Cal.App.4th at p. 440.) When Jaedicke became a director, he read section 8.85 of Illinois's Business Corporation Act of 1983, which states: "In discharging [its] duties . . . , the board of directors . . . may . . . consider the effects of any action . . . upon employees, suppliers and customers of the corporation or its subsidiaries, communities in which offices or other establishments of the corporation or its subsidiaries are located, and all other pertinent factors." (805 Ill. Comp. Stat. 5/8.85 (section 8.85).) But the Business Corporation Act excludes insurance companies (see 805 Ill. Comp. Stat. 5/3.05) because they "conduct a business charged with the public interest and are authorized and governed by a special act, more stringent in its regulations by reason of the nature of their business" (*Doggett v. No. Amer. Life Ins. Co.* (1947) 396 Ill. 354, 362 [71 N.E.2d 686, 689]).

Although Jaedicke read section 8.85 of the act, there is no evidence that he gave it any thought in making decisions related to dividends or the surplus. In fact, he testified during his deposition that he owed a duty of loyalty to State

Farm's policyholders and no one else. Further, section 8.85 permits, but does not require, a director to consider the interests of the listed constituencies: employees, suppliers, customers (policyholders), surrounding communities, and other pertinent factors. Plaintiffs made no showing that, under the statute, the *nonpolicyholders* had interests that differed from, or conflicted with, the policyholders' interest in dividends. Even if Jaedicke had given any weight to section 8.85, it would be pure speculation to assume that his decisions disadvantaged the policyholders. And, during his time on the Board, Jaedicke was one of 13 directors. No evidence suggests that any other director or officer considered section 8.85 in making dividend or surplus decisions. Thus, the statute did not influence the Board's decisions on those matters.

Plaintiffs also take issue with Jaedicke's testimony about the possible tax results to State Farm if it sold assets from the surplus to pay dividends. Plaintiffs submitted evidence indicating that the taxes would be entirely offset by a deduction allowed for the full amount of the dividend. Jaedicke, who admitted he was not "the expert on taxes," testified he did not believe any portion of the dividend would be deductible. Similarly, Hayward said in his declaration that State Farm would have to pay income taxes if it sold any part of the surplus. Plaintiffs seize on these isolated comments in arguing that the *Board's* confusion over tax issues led to the mistaken conclusion that State Farm should not sell any assets from the surplus. To the contrary, the *complete* testimony of Jaedicke and Hayward indicates that their real concern was not tax liability, if any, but the loss of the income-producing asset itself. And, again, Jaedicke was just one of several directors. His individual opinions about taxes were inconsequential given that no other director mentioned the subject. As for Hayward, he too conceded a lack of tax knowledge—"I'm not a tax expert"—and his tax opinions had no effect on the type of data he generated as an actuary. Finally, we have just explained that the Board as a whole, including Jaedicke, gave many reasons—other than taxes—for retaining the surplus. (See also pt. II.F., *post.*) The tax issue is a red herring.

E. *Decisions That Are Fraudulent or Dishonest*

 "[A]bsent one of the exceptions to the business judgment rule— [such as] fraud [or] dishonesty . . . —a corporation is not liable for a lack of dividends." (*State Farm II, supra*, 114 Cal.App.4th at p. 451.)

Given that the business judgment rule protects a board's mistakes, errors, and mere negligence (see pt. II.F., *post*), a plaintiff cannot circumvent that protection by simply characterizing a board's decisions as fraudulent or dishonest. "[A] mere mistake of judgment is not fraud." (*Public Service Comm. v. City of Indianapolis* (1922) 193 Ind. 37, 47 [137 N.E. 705, 708].)

Rather, fraud requires "evidence of improper motives on the part of the Board members." (*Lewis v. Playboy Enterprises, Inc.* (1996) 279 Ill.App.3d 47, 55 [215 Ill.Dec. 736, 742, 664 N.E.2d 133, 139].)

In *Kelly v. Bell* (Del.Ch. 1969) 254 A.2d 62, affirmed *sub nom. Ella M. Kelly & Wyndham, Inc. v. Bell* (Del. 1970) 266 A.2d 878, a corporation agreed to continue paying local tax assessments on its existing machinery in exchange for the county's support of state legislation that would gradually eliminate the taxes on all of its machinery. The legislation passed. On its annual reports to shareholders, the corporation continued to show its machinery payments as "taxes," although, by operation of the new law, the local authorities no longer had the authority to impose "taxes." (See *Kelly v. Bell*, at pp. 73–74.)

Shareholders brought suit against the directors, alleging that the annual reports fraudulently listed the payments as taxes. The directors moved for summary judgment, relying on the business judgment rule. (See *Kelly v. Bell, supra*, 254 A.2d at pp. 71–72, 75.) In opposition to the motion, the shareholders submitted an affidavit from a certified public accountant, who stated that listing the payments as taxes did not conform with generally accepted accounting principles. The court of chancery responded: "That may be. But for present purposes the test is not whether the reporting was in accordance with generally accepted accounting principles but rather whether, under all the evidence, the reporting was fraudulent." (*Id.* at p. 71.) The court concluded: "[T]here is not a shred of evidence to show that this procedure was adopted for sinister reasons. [¶] Under the circumstances, reporting the payments to stockholders in the form in which they were actually made [is] not . . . fraudulent. Certainly plaintiffs have made no showing that there was any purposeful effort on the part of any defendant to conceal the true nature of what was done from the stockholders." (*Ibid.*) On appeal, the Delaware Supreme Court affirmed, agreeing that the fraud exception did not apply because "[t]here is no evidence that any director or officer was motivated by expectation of personal gain, by bad faith or by any consideration other than that of doing what was best for [the company]." (*Ella M. Kelly & Wyndham, Inc. v. Bell, supra*, 266 A.2d at p. 879.)

In this case, plaintiffs advance two arguments in support of the fraud or dishonesty exception to the business judgment rule: first, State Farm should have disclosed to policyholders that it did not sell assets from the surplus to pay dividends; and second, the "Annual Report to Policyholders"—the one-page insert included with premium notices—contained fraudulent information. Both arguments fail.

### 1. *Source of Dividends*

In their opening brief, plaintiffs assert that policyholders are entitled to know, through their insurance policies and bylaws, the "actual dividend policies and practices that are followed by management and the Board." In support, plaintiffs cite two authorities, *Winger v. Richards-Wilcox Mfg. Co.* (1961) 33 Ill.App.2d 115 [178 N.E.2d 659] (*Winger*) and 3 Fletcher Cyclopedia of the Law of Private Corporations (2002 rev. vol.) section 837.70, pages 186–188. Neither is applicable.

*Winger* involved the predecessor version of section 7.75 of Illinois's Business Corporation Act (805 Ill. Comp. Stat. 5/7.75), which entitles a shareholder to examine the books and records of a corporation. (See *Winger, supra,* 178 N.E.2d at pp. 661, 664–665.) As plaintiffs have pointed out, the Business Corporation Act does not apply to insurance companies. (See 805 Ill. Comp. Stat. 5/3.05.) But assuming that mutual insurance companies must or do allow policyholders to examine their books and records, State Farm's dividend practices would not be found there. The Board considered several unwritten factors during lengthy discussions. Each meeting differed from the others due to changes in the company's financial condition and other circumstances. There was no written policy or practice in existence for anyone to examine.

Plaintiffs rely on the Fletcher treatise for the principle that "[d]irectors and officers of a corporation stand in a sufficiently confidential relation to the shareholders to impose a duty upon them to reveal all facts material to the corporate transactions, especially with regard to membership corporations or cooperatives . . . . A board's duty of complete candor to its shareholders to disclose all germane or material information applies to matters of corporate governance as well as to corporate transactions." (3 Fletcher Cyclopedia of the Law of Private Corporations, *supra,* § 837.70, pp. 186–187, fns. omitted.) This principle contemplates disclosure with respect to corporate transactions such as mergers, dissolutions, the removal of directors, the purchase of minority shareholders' stock by majority shareholders, the conversion of corporate funds, the acquisition of another corporation's assets, and recapitalization plans.

 But it does not apply to dividend decisions. (See 3 Fletcher Cyclopedia of the Law of Private Corporations, *supra,* § 837.70, pp. 186–187, fns. 3–6 and cases cited.) As the Illinois Supreme Court has recognized in insurance cases, "the parties [are] competent to contract and [have] *the right to insert such lawful provisions in the agreement as they* [*see*] *fit.*" (*Coons, supra,* 13 N.E.2d at p. 485, italics added.) Thus, insurers are not required to explain their dividend practices where the insurance policy

or bylaws provide otherwise—by vesting the board with broad discretion in the matter. Requiring that dividend practices be printed in the policy or bylaws would unnecessarily restrict the board's latitude in making dividend decisions. The information disclosed by State Farm was therefore sufficient.

More specifically, plaintiffs complain that State Farm's insurance policies and bylaws indicated that the Board would consider paying dividends from "earnings," "savings," and "gains" when the company did not consider the assets in the surplus as a source of dividends. Plaintiffs describe this nondisclosure about the surplus as fraudulent. If State Farm had disclosed that the surplus was off-limits, plaintiffs argue, policyholders would have had a *realistic* picture of their dividend prospects. We disagree for a number of reasons.

First, the representations in the policies and bylaws were literally true: Dividends *were* paid from "earnings," "savings," and "gains." In some years, State Farm paid dividends out of underwriting income (unneeded premium); in other years, when the company suffered an underwriting loss but nevertheless paid a dividend, investment income was used to make the payments. Consequently, we find no evidence of improper motives on the part of the Board.

Second, even if State Farm had made the disclosure sought, policyholders would not have had any better idea of the dividends they might receive. The insurance policies and bylaws did not indicate that dividends would be declared in any particular amount, manner, or time. Any disclosure about the surplus would have been of no assistance.

Third, as the adage goes, "A job half done is a job not done." *Several* factors were considered in deciding whether to declare a dividend and its amount. A disclosure about the surplus alone would have been open to attack as misleading. It would have simply given policyholders reason to complain that the company had not disclosed *other* aspects of its decisionmaking process, such as relying on underwriting results, focusing on income *by state*, taking net income into account, and reviewing the company's net worth. In other words, State Farm could not have described its dividend practices in a way that would have satisfied all of its policyholders. It faced a "damned if you do, damned if you don't" situation. Litigation would be possible either way.

Last, State Farm complied with whatever duty of disclosure it may have had by issuing the "Annual Report to Policyholders," which summarized State Farm's financial condition. The reports typically distinguished between underwriting results and the surplus. For instance, the 1992 report said: "State

Farm Mutual's results showed improvement again in 1992. Policyholders in 19 states, where claims experience was better than expected, shared in $169.3 million in dividends. Net income from all sources was about $48 per policy and went into the Policyholder Protection Funds."

### 2. *Annual Reports to Policyholders*

Even if the law "imposes no duty upon directors to furnish annual reports to shareholders . . . , corporate directors must honestly disclose all material facts when they undertake to give out written statements concerning the condition or business of their corporation." (*Hall, et al. v. Isaacs, et al.* (1958) 37 Del.Ch. 530, 542–543 [146 A.2d 602, 609–610], citation omitted, revd. on another point (1960) 39 Del.Ch. 244 [163 A.2d 288].) "[D]irectors owe a duty to honestly disclose all material facts when they undertake to give out statements about the business to stockholders." (*Kelly v. Bell, supra,* 254 A.2d at p. 71; accord, 3 Fletcher Cyclopedia of the Law of Private Corporations, *supra,* § 837.70, p. 187 ["fraud may result from the concealment of material facts . . . in the annual or other reports . . ."].) "Generally, knowledge of corporate records and documents is imputed to all directors." (*In re Illinois Valley Acceptance Corp.* (C.D.Ill. 1982) 531 F.Supp. 737, 740.)

In their opposition papers, plaintiffs rely on the opinions of three experts in arguing that the annual reports to policyholders were misleading. The annual reports listed the amount of assets, liabilities, policyholder protection funds, and a summary of operating data. Each of those categories was further broken down into subcategories, and the amount of each subcategory was shown. A final entry stated net income. All of this information, plus a list of the directors by name and title, occupied a small column measuring approximately six inches by 2.5 inches.

We see no need to discuss each of the alleged misleading aspects of the reports. The figures and terminology in the policyholder reports were taken from the Audited Reports, which Coopers & Lybrand prepared in compliance with the accounting principles prescribed or permitted by the Illinois Department of Insurance. Admittedly, the Audited Reports were not prepared according to generally accepted accounting principles (GAAP). The state did not accept GAAP. State Farm's use of Illinois's accounting principles in preparing the policyholder reports does not support an inference of fraud or dishonesty. " 'It is not fraud to do what one has a legal right [or obligation] to do.' " (*State, et al. v. Wilbe Lumber Co.* (1953) 217 Miss. 346, 359 [64 So.2d 327, 331], italics omitted.) "That which the law authorizes cannot constitute a legal wrong." (*Yoder v. Givens* (1942) 179 Va. 229, 238 [18 S.E.2d 380, 384].)

The Audited Reports began with four "Statements," each consisting of a single page of numerical data covering, respectively: (1) income; (2) changes in surplus; (3) cash flows; and (4) admitted assets, liabilities, and surplus. Following the Statements were several pages of "Notes," explaining the Statements in more detail. To take an example, the 1998 Audited Report had four pages of Statements and 22 pages of Notes.

Plaintiffs accuse State Farm of fraud and dishonesty on the ground that the small column of financial data in the annual policyholder reports did not contain *all* of the explanatory information set forth in the Notes. That accusation ignores the limited purpose of the policyholder reports: to provide a brief overall picture of State Farm's financial condition at the time of the premium notices. Consistent with that purpose, the policyholder reports focused on the numerical data in the Statements; the reports did not include the detailed information in the Notes, such as whether the assets in the pension plan exceeded liabilities. Again, we see nothing sinister here.

### F. *Decisions That Are Totally Without Merit*

Illinois courts have stated that the business judgment rule does not protect a decision that is " 'totally without merit.' " (*State Farm II, supra,* 114 Cal.App.4th at p. 450, italics omitted.) Similarly worded exceptions— decisions made "by mistake" or "wrongfully"—have found their way into Illinois cases. (See, e.g., *Lubin, supra,* 61 N.E.2d at p. 758.)

But the cases purporting to recognize such exceptions have applied the business judgment rule without reviewing the merits of the boards' decisions. (See *Romanik v. Lurie Home Supply Center* (1982) 105 Ill.App.3d 1118, 1134–1135 [61 Ill.Dec. 871, 882, 435 N.E.2d 712, 723]; *Coduti v. Hellwig* (1984) 127 Ill.App.3d 279, 285–286 [82 Ill.Dec. 686, 692, 469 N.E.2d 220, 226], overruled on another point in *Schirmer v. Bear* (1996) 174 Ill.2d 63 [220 Ill.Dec. 159, 672 N.E.2d 1171]; *Hofeller v. General Candy Corp.* (1934) 275 Ill.App. 89, 96–97; *Lubin, supra,* 61 N.E.2d at p. 758.) Under these cases, the business judgment rule applies as long as the board was motivated by a business reason as opposed to a purpose that was fraudulent (*Romanik*), oppressive (*Romanik, Coduti, Hofeller*), or unlawful (*Lubin*).

In *Barnes, supra,* 16 Cal.App.4th 365, this division examined the exceptions to the business judgment rule under Illinois law, stating that "totally without merit," "by mistake," and "wrongfully," together with the other exceptions, were synonymous with fraud, oppression, corruption, or conflict of interest. (See *id.* at p. 379 & fn. 13.) In other words, the "totally without merit" exception focuses on the *process* of making the decision, not the decision itself. (See *id.* at p. 379, fn. 14.)

The business judgment rule is premised on the reality that " 'courts are ill equipped to engage in post hoc *substantive review* of business decisions.' " (*Shaper v. Bryan* (2007) 371 Ill.App.3d 1079, 1092 [309 Ill.Dec. 635, 646, 864 N.E.2d 876, 887], italics added & omitted.) The very purpose of the rule is to preclude liability for a board's mistakes, errors, or mere negligence. (See *Schirmer v. Bear* (1995) 271 Ill.App.3d 778, 785 [208 Ill.Dec. 209, 213, [648 N.E.2d 1131, 1135], affd. (1996) 174 Ill.2d 63 [220 Ill.Dec. 159, 672 N.E.2d 1171]; *Selcke v. Bove, supra,* 258 Ill.App.3d at p. 935 [196 Ill.Dec. at p. 205, 629 N.E.2d at p. 750]; *Bane v. Ferguson* (7th Cir. 1989) 890 F.2d 11, 14; *Joy v. North* (2d Cir. 1982) 692 F.2d 880, 885–886, superseded by statute on another point as stated in *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1159, fn. 8 [96 Cal.Rptr.2d 128].) It would make little sense, then, to create an exception for decisions that are wrong. Such an exception would swallow the rule.

"The theory behind the business judgment rule is that directors are not required to guarantee that their decisions will succeed, rather they are only expected to use ordinary and reasonable care in making corporate policy. Few directors would serve on boards if the *merits* of their decisions were subject to *substantive* scrutiny . . . ." (*Atwood Grain & Supply Co. v. Growmark, Inc., supra,* 712 F.Supp. at p. 1366, fn. 4, italics added.) "Thus, a court will invoke the business judgment rule and refuse to scrutinize the merits of the business decision made by business persons who are likely more competent in the particular business matters at issue." (*Id.* at p. 1367, fn. 5.)

"[T]he business judgment rule is *'process* oriented.' . . . The [directors'] duty of care does not have a substantive element and courts do not 'measure, weigh or quantify directors' judgments.' . . .

" 'What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate [mistake], apart from consideration of the good faith or rationality of the *process employed.* That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational," provides no ground for . . . liability, so long as the court determines that the *process* employed was either rational or employed in a good faith effort to advance corporate interests. To employ a different rule—one that permit[s] an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is *process* oriented and informed by a deep respect for all good faith board

decisions.' " (*In re Fleming Packaging Corp., supra,* 370 B.R. at p. 784, citations omitted, italics added & omitted; accord, *Salsitz v. Nasser* (E.D.Mich. 2002) 208 F.R.D. 589, 595; *Cuker v. Mikalauskas* (1997) 547 Pa. 600, 610–611 [692 A.2d 1042, 1047–1048].)

In *Shlensky v. Wrigley* (1968) 95 Ill.App.2d 173 [237 N.E.2d 776] (*Shlensky*), a shareholder challenged the board's refusal to install lights at Wrigley Field and its failure to schedule night games, alleging a negligent loss of corporate income because the Chicago Cubs had to play their home games during the day. In affirming the dismissal of the suit, the Illinois Appellate Court explained: " '[Judges] will not undertake to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted and the business more successful if other methods were pursued.' " (*Id.,* 237 N.E.2d at p. 778.) The court discussed the board's decision in the context of the business judgment rule, concluding: "By these thoughts we do not mean to say that we have decided that the decision of the directors was a correct one. That is beyond our jurisdiction and ability. We are merely saying that the decision is one properly before [the] directors and the *motives* alleged in the amended complaint showed no fraud, illegality or conflict of interest *in their making of that decision.*" (*Id.* at p. 780, italics added.)

*Shlensky* discussed *Dodge v. Ford Motor Co.* (1919) 204 Mich. 459 [170 N.W. 668], in which the Michigan Supreme Court affirmed a decree directing Ford Motor Company to pay dividends. *Dodge* reasoned that " 'shareholders forming an *ordinary business corporation* expect to obtain the profits of their investment in the form of regular dividends.' " (*Id.,* 170 N.W. at p. 682, italics added.) *Shlensky* interpreted *Dodge* to mean that "there must be fraud or a breach of that good faith which directors are bound to exercise toward the stockholders in order to justify the courts entering into the internal affairs of corporations." (*Shlensky, supra,* 237 N.E.2d at pp. 779–780.) And in *Churella v. Pioneer State Mut. Ins. Co.* (2003) 258 Mich.App. 260, 272 [671 N.W.2d 125, 132], the court held that *Dodge's* rationale does not apply to mutual insurance companies.

" '[C]ourts give deference to directors' decisions reached by a proper *process,* and do not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself.' A court does not 'substitute its own notion of what is or is not sound business judgment' in place of the board's judgment. Additionally, '[a]pproval of a transaction by a majority of independent, disinterested directors almost always bolsters [the] presumption that the business judgment rule attaches to [that] transaction[] . . . [if it is] later attacked on grounds of lack of due care.' " (*Mueller v. Zimmer* (2005)

2005 WY 156 [124 P.3d 340, 351–352], italics added; see *Orman v. Cullman, supra,* 794 A.2d at pp. 23–24 [defining "independent" and "disinterested" director].)

In short, the business judgment rule must first be found inapplicable under an exception—such as fraud, oppression, or illegality—before the trier of fact may examine the merits of a board's decision. (See *Brehm v. Eisner, supra,* 746 A.2d at p. 264 & fn. 66; *In re Brokers, Inc.* (Bankr. M.D.N.C. 2007) 363 B.R. 458, 473–474.) Unless one of those exceptions applies—and plaintiffs have not made any such showing—there is no liability for "erroneous judgments." (*Stamp v. Touche Ross & Co., supra,* 636 N.E.2d at p. 621.)

Here, plaintiffs offered expert testimony to the effect that the Board's decisions on dividends, rate reductions, and the surplus were wrong on the merits. But in light of the evidence submitted by both sides, plaintiffs did not make a showing that the Board's decisionmaking *process* was tainted by fraud, oppression, illegality, or a similar purpose. "[P]laintiff's [evidence merely] questions th[e] decisions which [the directors] made. This is exactly the type of second-guessing which the business judgment rule was designed to preclude." (*Stamp v. Touche Ross & Co., supra,* 636 N.E.2d at p. 622.)

In accordance with the "totally without merit" exception, State Farm did not act with a fraudulent, oppressive, illegal, or similar purpose. Instead, it was motivated by several business goals: maintaining low premiums, retaining funds needed in the event of a catastrophe, making rate cuts, engaging in competition, supporting growth of the business, protecting the financial condition of its subsidiaries, and attempting to avoid the dangers of market volatility. It follows that this exception does not apply.

 Nevertheless, plaintiffs contend that State Farm wrongfully provided financial assistance to its subsidiaries. Under corporate rules of governance, however, " 'a [parent corporation] should show concern about a [subsidiary's] affairs, ask for reports, sometimes consult with its officers, give advice, and even object to a proposed action . . . .' . . . 'Activities . . . which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures are evidence of a normal parent-subsidiary relationship . . . .' " (*Albright v. Attorney's Title Ins. Fund* (D. Utah 2007) 504 F.Supp.2d 1187, 1210, citation omitted.) " 'Capital infusions from a parent to a subsidiary are a normal, and, indeed, a necessary part of the parent-subsidiary relationship . . . .' " (*Id.* at p. 1211; accord, *Hill v. Dearmin* (1980) 44 Colo.App. 123, 124–125 [609 P.2d 127, 128–129].) "The obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations." (*Lowell Staats Min. Co. v. Pioneer Uravan, Inc.* (10th Cir.

1989) 878 F.2d 1259, 1263.) "[A parent company] will not be exposed to liability . . . when [the parent] contributes funds to [the subsidiary] for the purpose of assisting [it] in meeting its financial obligations . . . ." (*Ibid.*)

In essence, plaintiffs argue that any act of perceived unfairness should render the business judgment rule inapplicable. They claim a litany of supposed wrongs: (1) the Board amended the bylaws, making it more difficult for policyholders to choose directors; (2) rate cuts (as opposed to dividends) are unfair to persons with lapsed policies; (3) gaps of more than a year between dividends are unfair to some policyholders; (4) State Farm should have considered taking any "unneeded surplus" from its subsidiaries to pay dividends to its own policyholders; and (5) State Farm should have raised money for dividends by selling one or more of its subsidiaries or by selling "surplus notes." But these choices appear to involve the quintessential exercise of business judgment. And they do not come within any exception to the business judgment rule.

In closing, we emphasize: " 'The fact that a corporation has earned profits out of which directors might lawfully declare a dividend . . . is insufficient alone to justify judicial intervention compelling a declaration and payment.' " (*State Farm II, supra,* 114 Cal.App.4th at p. 451.) In 1988, State Farm policyholders filed a suit similar to this one, seeking to compel the company to distribute its alleged "excess" surplus (*Barnes v. State Farm Mutual Automobile Ins. Co.* (Super. Ct. L.A. County, 1988, No. CA001131)). That suit was dismissed on demurrer. This division affirmed, quoting the superior court with approval: " 'The mere fact that this corporation has a surplus of $20 billion, massive though that is, . . . does not constitute a fact that would warrant this Court in taking over the dividend and surplus policy of this company.' " (*Barnes, supra,* 16 Cal.App.4th at p. 379, fn. 14.) In the present case, having had the benefit of the parties' evidence on the issues, we conclude that the Board, not the courts, should still be left to run the company.

Plaintiffs asserted three theories of liability: breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Unfair Competition Act. The claim for breach of contract (duty of care) is precluded by the business judgment rule. The covenant claim is not an independent cause of action under Illinois law. (See *State Farm II, supra,* 114 Cal.App.4th at pp. 451–453.) And liability imposed by the California Unfair Competition Act requires the commission of an "unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200; see *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].) State Farm did not engage in such conduct. Plaintiffs are therefore not entitled to an accounting. The trial court properly granted summary judgment.

## III

## DISPOSITION

The judgment is affirmed.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied October 7, 2008, and appellants' petition for review by the Supreme Court was denied December 10, 2008, S167913.